# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

HERMINE BYFIELD

                        Plaintiff,

    vs.

HEALTHCARE REVENUE RECOVERY GROUP,
LLC; and DOES 1 through 10, inclusive,

                      Defendants

CIVIL ACTION
NO. 2:18-cv-00243-PBT

## DEFENDANT, HEALTHCARE REVENUE RECOVERY GROUP, LLC'S
## STATEMENT OF UNDISPUTED FACTS

Defendant, Healthcare Revenue Recovery Group, LLC (hereinafter "HRRG"), by and through its counsel, Marks, O'Neill, O'Brien, Doherty & Kelly, P.C., hereby submits this Statement of Undisputed Material Facts in support of Defendant's Motion for Summary Judgment, pursuant to Fed. R. Civ. P. 56.

## I.    Procedural History

1.    Plaintiff, Hermine Byfield, initiated this action by filing a Complaint against HRRG on January 19, 2018. [ECF 1].

2.    HRRG filed an Answer to the Complaint with Affirmative Defenses on March 20, 2018. [ECF 6].

3.    Fact discovery in this matter ended on November 4, 2021.

4.    At the Rule 16 Conference on June 26, 2018, HRRG sought leave to file a motion for judgment on the pleadings, or alternatively, a motion for summary judgment on the basis that HRRG did not violate the FDCPA because the MVFRL's cost containment provisions under Section 1797(a) did not apply as a matter of law.

5. Subsequently, the Court issued an Order on June 28, 2018 requiring the Parties to submit briefs addressing the issue. [ECF 11].

6. HRRG's Brief was filed on September 7, 2018. [ECF 13].

7. Plaintiff filed her Brief on September 7, 2018. [ECF 14].

8. To date, the Court has not ruled on HRRG's Motion.

## II.   Allegations in Complaint

9. Plaintiff alleges that HRRG sent a letter to her on August 3, 2017 which violated the Fair Debt Collection Practices Act ("FDCPA"). _See_ Compl. [ECF 1] at ¶ ¶ 18-20; _see also_, a copy of Plaintiff's deposition transcript, dated September 29, 2021, attached hereto as **Exhibit "A"** at 47:19-48:1.

10. Plaintiff alleges that she was injured in an automobile accident and "went to Nazareth Hospital . . . for evaluation and treatment." _See_ Compl. [ECF 1] at ¶ 17.

11. Plaintiff contends that "[o]n or about August 3, 2017, Defendant [HRRG] sent her a letter, written on behalf of the provider, regarding Plaintiff's alleged obligation to pay the provider for the above-referenced evaluation and treatment." _See_ Compl. [ECF 1] at ¶ 18.

12. Plaintiff alleges that "Defendant's correspondence explicitly identifie[d] $900.00 as the 'Amt. Owed.'" _See_ Compl. [ECF 1] at ¶ 19.

13. Plaintiff alleges the "'Amt Owed' that Defendant sought to collect -- $900.00 -- is the total outstanding balance claimed by the provider, without application of the Act 6 Reduction." _See_ Compl. [ECF 1] at ¶ 26.

14. Plaintiff alleges that "neither the provider nor the Defendant even attempted to re-calculate the 'Amt Owed' to determine what the provider may ask for or receive under the [Motor Vehicle Financial Responsibility Law ("MVFRL")]." _See_ Compl. [ECF 1] at ¶¶ 27.

15. Plaintiff contends that "[HRRG]'s actions violated the applicable provisions of the [FDCPA], in that, Defendant explicitly claimed that Plaintiff owed an amount that was in excess of what its client - the provider - was permitted by law to collect (or even ask for) under the MVFRL." *See* Compl. [ECF 1] at ¶ 31.

16. In Count I of the Complaint, Plaintiff alleges that HRRG violated 15 U.S.C. § 1692f(1) of the FDCPA, by "seeking payment of an amount in excess of what Defendant was allowed to collect . . . ." *Id.* at ¶ 61.

17. Plaintiff individually seeks actual damages, statutory damages and attorneys' fees and costs under the FDCPA. *Id.*

## III. Factual Background

### A. Plaintiff's Treatment in the Emergency Room at Nazareth Hospital following her Auto Accident on Nov. 2, 2015

18. On Nov. 2, 2015 Plaintiff was involved in an automobile accident at the intersection of Bustleton Avenue and Solly Avenue in Philadelphia, Pennsylvania. *See* Ex. A, Byfield Dep. at 12:6-13.

19. As Plaintiff was passing through the intersection, an oncoming vehicle crossed into her lane and collided "head-on" with Plaintiff's 2014 Nissan Rogue. *Id.* at 12:16-13:9.

20. The other driver involved in the accident was Desirae Schullere Douglas. *Id.* at 13:10-13; *see also*, a copy of Plaintiff's complaint filed in the Philadelphia County Court of Common Pleas on Aug. 30, 2017 (No. 170803130) ("PCCP Complaint") attached as **Exhibit "B"** at ¶ 8.

21. At the time of the accident, Ms. Douglas was driving a rental car owned by Avis Rent-A-Car. *See* Ex. B, PCCP Compl. at ¶ 8; *see also*, a copy of the deposition transcript of

Nationwide Insurance Company's representative, Kelly Patterson Lanes, dated October 28, 2021, attached hereto as **Exhibit "C"** at 17:8-10.

22.     The impact from the collision caused Plaintiff to suffer physical injuries, including to her back and neck. Ex. A, Byfield Dep. at 13:17-21.

23.     On Nov. 2, 2015, Plaintiff was treated by Dr. Jojo Hammond in the Emergency Room at Nazareth Hospital in Philadelphia, Pennsylvania for injuries from the auto accident. _See_ a copy of Plaintiff's  emergency room medical record from Nazareth Hospital attached hereto as **Exhibit "D";** _see also_, Ex. A, Byfield Dep. at 15:24-16:16.

24.     At the time she presented to the Emergency Room at Nazareth Hospital, Plaintiff executed a Consent for Hospital Treatment and Services form.  _See_ a copy of the Consent for Hospital Treatment and Services form executed by Plaintiff, dated Nov. 2, 2015, produced by Nazareth Hospital in response to Subpoena by HRRG and bates labeled NAZARETH-000035, attached hereto as **Exhibit "E".**

25.     The Consent for Hospital Treatment and Services form, in relevant part, states that by signing the patient is agreeing to the following:

> 9.  _I hereby assign to the Hospital payment of all hospital and insurance benefits otherwise payable to me or for my benefit in connection with my treatment and/or hospitalization._
>
> 10. _In consideration of the care and services to be furnished to me, I undertake and promise to pay for these services (to the extent that the charges are not covered by any insurance benefits) in accordance with Hospital terms and usual and customary charges._
>
> 11. _The professional services of physicians are billed separately from the hospital, such as the departments of Anesthesia, Pathology, Emergency, Radiology, Neurology, Cardiology, and Physician Medicine._

_Id_.

26. Plaintiff understood that when she presented for treatment in the Emergency Room at Nazareth Hospital on Nov. 2, 2015 that she would be charged for the treatment that she received. Ex. A, Byfield Dep. at 43:19-45:10.

27. Plaintiff also understood that if her insurance did not pay for her treatment in the Emergency Room at Nazareth Hospital on Nov. 2, 2015 that she would be personally responsible for paying her treatment. *Id.* at 44:11-45:10.

28. Plaintiff's treatment included being X-rayed and receiving pain medication. Ex. A., Byfield Dep. at 13:25-14:4.

29. Dr. Hammond was an employee of Emergency Care Services of Pennsylvania, P.C. ("Emergency Care" or the "Provider) at the time she treated Plaintiff. *See* a copy of the Health Insurance Claim Forms, dated January 19, 2016, April 19, 2016, November 28, 2016 and August 17, 2017, submitted to Nationwide by the provider for reimbursement of Plaintiff's charges for her treatment attached hereto as **Exhibit "F".**

30. Emergency Care charged a fee of $900.00 for the treatment Plaintiff received from Dr. Hammond in the Emergency Room at Nazareth Hospital on Nov. 2, 2015 in accordance with Nazareth Hospital's "usual and customary charges." *See* a copy of a patient billing statement, dated Feb. 20, 2018, issued by Emergency Care attached hereto as **Exhibit "G"**.

31. Emergency Care billed Plaintiff for the treatment that Plaintiff received from Dr. Hammond in the Emergency Room at Nazareth Hospital on Nov. 2, 2015. *Id.*; *see also*, Ex. A, Byfield Dep., at 25:15-26:9.

32. To date, the $900 charge for Plaintiff's treatment by Emergency Care has not been paid. *See* Ex. A., Byfield Dep. at 32:2-7; *see also*, a copy of Nationwide representative Kimberly

Glasgow's deposition transcript, dated October 28, 2021, attached hereto as **Exhibit "H"** at 22:23-23:23.

### B. Plaintiff's Nationwide Policy

33. At the time of the accident, Plaintiff maintained auto insurance on the 2014 Nissan Rogue she was operating through Nationwide Property and Casualty Insurance Company ("Nationwide"). *See* Ex. A., Byfield Dep. at 17:3-15; *see also*, Ex. H, Glasgow Dep., at 7:4-18; 11:13-25; *see also*, a copy of Plaintiff's Nationwide Policy Declaration Page produced by Plaintiff attached hereto as **Exhibit "I"**.

34. A true and correct copy of Plaintiff's Nationwide Automobile Insurance Policy (Policy No. 5837E 925160) in effect at the time of the auto accident, with effective dates of Aug. 29, 2015 to Feb. 29, 2016 ("Nationwide Policy"), was produced by Nationwide in response to HRRG's Subpoena and is attached hereto as **Exhibit "J".**

35. The Nationwide Policy included, in relevant part, the following coverages in relation to Plaintiff's 2014 Nissan Rogue:

|   |   |   |
|---|---|---|
| a. | First-Party Benefits<br>Option 1-Medical Benefit | **$5,000** |
| b. | Uninsured Motorists-Bodily Injury | **$15,000** Each Person /<br>**$30,000** Each Occurrence |
| c. | Underinsured Motorists-Bodily Injury | **$15,000** Each Person /<br>**$30,000** Each Occurrence |

*See* Ex. I, Policy Declarations, at p. 2; *see also*, Ex. H, Glasgow Dep. at 12:20-13:2; Ex. C, Lanes Dep. at 48:7-22.

36. In response to a Subpoena served on behalf of HRRG seeking testimony from the person(s) most knowledgeable of Plaintiff's auto accident claim, Nationwide produced two representatives, Kimberly Glasgow and Kelly Patterson Lanes, who both appeared and testified at

deposition on October 28, 2021. _See_ Ex. H, Glasgow Dep. at 6:8-7:3; _see also_, Ex. C, Lanes Dep. at 7:15-8:4.

37.    Ms. Glasgow testified she has been employed as a Claims Specialist 3 PIP insurance adjuster with Nationwide for 15 years.  _See_ Ex. H, Glasgow Dep. at 7:19-8:1.

38.    Ms. Lanes testified she has been employed as a Casualty Specialist 3 adjuster with Nationwide for 24 years.  _See_ Ex. C, Lanes Dep. at 5:16-6:1.

39.    Nationwide's Policy provides the following with regard to First Party Benefits:[1]

**First Party Benefits**

**Coverage Agreement**

This coverage provides First Party Benefit options in accordance with the Pennsylvania Motor Vehicle Financial Responsibility law. The options and limits which the **policyholder** has selection are shown in the Declarations.

**We** will pay First Party Benefits for the **bodily injury** or an **insured** as a result of an accident that arises out of the maintenance or use of a **motor vehicle** as a **motor vehicle**. **We** will pay these benefits regardless of who is at fault in the accident.

**Insureds**

The **policyholder** and relatives covered while **occupying** or injured by any **motor vehicle**.…

**Options**

***Option 1–Medical Benefit***
**We** will pay all reasonable expenses for **necessary medical treatment and rehabilitative services**.

**We** will pay such expenses up to the limit shown on the Declarations….

Ex. J, Nationwide Policy, at p. 7.

40.    Nationwide's Policy provides the following with regard to Uninsured Motorist Benefits (or "UM Benefits"):

**Uninsured motorists – bodily injury**

**Coverage Agreement**

---

[1] First Party Benefits are also referred to at times as Personal Injury Protection coverage or "PIP benefits".  _See_ Ex. F, Glasgow Dep. at 9:1-8.

***You and a relative***
**We** will pay compensatory damages, including derivative claims, which are due by law to you or a **relative** from the owner or driver of an **uninsured motor vehicle** because of bodily injury suffered by **you** or a **relative**….

***Recovery***
1. Before recovery, **we** and any injured party seeking protection under this coverage must agree on two points:

   a) whether there is a legal right to recover damages from the owner or driver of an **uninsured motor vehicle**; and if so,

   b) the amount of such damages.

2. Any judgment against the uninsured will be binding on **us** only if it has **our** written consent….

***Definition***
1. An **uninsured motor vehicle** is:

   a) one for which there is no bodily injury liability bond or insurance at the time of the accident….

2. We will not consider as an **uninsured motor vehicle**:

   a) a **motor vehicle** for which there is liability insurance or self-insurance applicable at the time of the accident….

**Limits and conditions of payment**

***Amounts payable for Uninsured motorists – bodily injury losses***
**Our** obligation to pay Uninsured motorists – bodily injury losses is limited to the amounts per person and per occurrence stated in the policy Declarations….

<u>Id</u>. at pp. 13-17.

41.     Nationwide's Policy provides the following with regard to Underinsured Motorist

Benefits (or "UIM Benefits"):

**Underinsured motorists – bodily injury**

**Coverage Agreement**

***You and a relative***
**We** will pay compensatory damages, including derivative claims, which are due by law to you or a **relative** from the owner or driver of an **underinsured motor vehicle** because of bodily injury suffered by **you** or a **relative**….

***Recovery***
1. Before recovery, **we** and any injured party seeking protection under this coverage must agree on two points:

a) whether there is a legal right to recover damages from the owner or driver of an **underinsured motor vehicle**; and if so,

b) the amount of such damages.

2. Any judgment against the underinsured will be binding on **us** only if it has **our** written consent….

*Definition*
1. An **underinsured motor vehicle** is a **motor vehicle** for which bodily injury liability coverage, bonds or insurance are in effect. However, their total amount is insufficient to pay the damages an **insured** is entitled to recover. **We** will pay damages that exceed such amount.

2. We will not consider as an **underinsured motor vehicle**:

a) a **motor vehicle** for which there is sufficient liability insurance or self-insurance applicable at the time of the accident to pay losses and damages….

**Limits and conditions of payment**

***Amounts payable for Underinsured motorists – bodily injury losses***
**Our** obligation to pay Underinsured motorists – bodily injury losses is limited to the amounts per person and per occurrence stated in the policy Declarations….

*Id*. at pp. 19-23.

42.     Before coverage is triggered for "Uninsured Motorist benefits – bodily injury losses" for a claim made by an Insured under Nationwide's Policy, Nationwide must first determine that the "at-fault" driver is liable to the Insured for "bodily injuries" and has no automobile insurance coverage available. *See* Ex. J, Nationwide Policy, at pp. 13-17; *see also*, Ex. H, Glasgow Dep. at 14:1-13; *see also*, Ex. C, Lanes Dep. at 14:5-19.

43.     Before coverage is triggered for "Underinsured Motorist benefits – bodily injury losses" for a claim made by an Insured under Nationwide's Policy, Nationwide must first determine that the "at-fault" driver is liable to the Insured for "bodily injuries" and has insufficient automobile insurance coverage available. *See* Ex. J, Nationwide Policy, at 19-23; *see also*, Ex. H, Glasgow Dep. at 14:1-13; *see also*, Ex. C, Lanes Dep. at 13:15-14:3.

**C. Emergency Care Properly Submitted the $900 Bill to Nationwide for Payment, But It Was Denied Because Plaintiff's Benefits Were Exhausted**

44. Following the accident, Plaintiff made a claim to Nationwide for insurance benefits under Nationwide's Policy. Ex. A, Byfield Dep. at 21:6-17.

45. Nationwide assigned Plaintiff's auto accident claim Number 313055-GC. *See* Ex. H, Glasgow Dep. at 7:14-18; *see also*, Ex. C, Lanes Dep. at 7:15-18:12.

46. Plaintiff was initially assigned two claims adjusters by Nationwide - one to handle the property damage to her vehicle and one to handle the medical portion of her claims. Ex. A., Byfield Dep. at 21:6-23:3; *see also*, Ex. H, Glasgow Dep. at 14:1-13; *see also*, Ex. C, Lanes Dep. at 14:1-13.

47. The Nationwide adjuster assigned to handle the medical portion of Plaintiff's auto insurance claim was Kristin Cobb. *See* a copy of Explanation of Review documents produced by Nationwide, dated February 5, 2016, March 2, 2016, April 1, 2016, April 28, 2016, December 7, 2016, issued by Ms. Cobb, attached hereto as **Exhibit "K";** *see also*, Ex. H, Glasgow Dep. at 9:9-15.

48. Ms. Cobb is no longer employed by Nationwide. *See* Ex. H, Glasgow Dep. at 9:9-15. As a result, Ms. Glasgow testified on behalf of Nationwide in response to HRRG's Subpoena regarding Plaintiff's claim for First Party benefits or also known as PIP benefits. *Id*. at 6:13-7:3.

49. Prior to filing suit in state court on August 30, 2017, Plaintiff did not make a claim under Nationwide's Policy for Uninsured Motorist benefits and/or Underinsured Motorist. *See* Ex. H, Glasgow Dep. at 14:1-13; *see also*, Ex. C, Lanes Dep. at 9:9-17; *see also*, Ex. A, Byfield Dep, at 69:20-70:3.

50. However, after Plaintiff filed suit in state court in Philadelphia County, Pennsylvania, Ms. Lanes was assigned by Nationwide as the UM/UIM adjuster for Plaintiff's claim. *See* Ex. C, Lanes Dep. at 8:12-9:10:2.

51. Plaintiff's medical providers that provided her with treatment for injuries she sustained in the auto accident submitted medical bills to Nationwide for payment under Plaintiff's First Party Benefits or "PIP coverage." *See* a true and correct copy of the PIP and Medical Payments Log for Claim Number 313055-GC produced by Nationwide in discovery (hereinafter "PIP Log") attached hereto as **Exhibit "L"**.

52. The PIP Log produced by Nationwide reflects that Plaintiff's medical providers submitted various bills to Nationwide for reimbursement reportedly received by Nationwide between Feb. 2, 2016 through Aug. 25, 2017. *See id.*; *see also*, Ex. H, Glasgow Dep. at 47:14-25.

53. The PIP Log reflects that in each instance all of Plaintiff's providers submitted the full amount of the charge for their services to Nationwide for reimbursement. *See* Ex. L; *see also*, Ex. H, Glasgow Dep. at 48:22-50:24.

54. The PIP Log further reflects that in each instance Nationwide paid an amount less than the full amount of the charge to the provider as reimbursement. *See* Ex. L; *see also*, Ex. H, Glasgow Dep. at 48:22-51:12.

55. When a medical provider submits a bill to Nationwide for payment, the amount to be reimbursed is determined by Nationwide pursuant to Act 6 under the Pennsylvania MVFRL. Ex. H, Glasgow Dep. at 21:15-22:2; 46:4-14.

56. Nationwide utilizes a third-party company, Auto Injury Solutions ("AIS"), which calculates the amount owed to the provider after applying the Act 6 Reduction. Ex. H, Glasgow Dep. at 21:15-22:2; 46:4-14.

57.     Nationwide automatically generates an Explanation of Review document (also referred to as an "Explanation of Benefits") that is sent to the provider, which includes the amount determined to be reimbursed, if any, as well as an explanation for the review amount or denial of payment, if appropriate. *See* Ex. K, Explanation of Review documents; *see also*, Ex. H, Glasgow Dep. at 25:23-26:19.

58.     In her 15 years' experience as a PIP adjuster, Ms. Glasgow has **never** known of a medical provider to calculate the amount owed under Act 6 of the MVFRL before submitting the bill to the auto insurance carrier for reimbursement, which was **always** handled by the carrier. *See* Ex. H, Glasgow Dep. at 22:4-8.

59.     The medical provider submits an Insurance Claim Form to Nationwide with the full amount of the charge for the treatment listed and the applicable Medicare code, then Nationwide or its third-party vendor, AIS, will perform the Act 6 recalculation prior to paying the provider. *Id.*. at 74:8-75:2.

60.     The Act 6 recalculation is also reflected in the Explanation of Review document that Nationwide sends to the medical provider in response to their claim for payment. *See generally*, Ex. K, Explanation of Review documents.

61.     Emergency Care first submitted the $900.00 bill for the treatment Plaintiff received in the Emergency Room at Nazareth Hospital for payment by Nationwide on January 19, 2016. *See* Ex. H, Glasgow Dep. at 17:9-18:6; *see also*, Ex. F, Insurance Claim Form, dated January 19, 2016; see also Ex. D, Nazareth ER Record; Ex. E, Consent for Hospital Treatment & Services.

62.     The PIP Log produced by Nationwide reflects that it received the $900.00 bill from Emergency Care on Feb. 3, 2016. *See* Ex. L.

63.     According to Nationwide, Emergency Care failed to attach supporting medical records to the bill. _See_ Ex. H, Glasgow Dep. at 17:9-18:6; _see also_, Ex. F, Insurance Claim Form, dated January 19, 2016.

64.     Because the $900.00 bill from Emergency Care was submitted to Nationwide without the medical records attached to it, Nationwide did not reimburse the provider and initially asked for the provider to resubmit the bill for payment with the necessary records. _See_ Ex. H, Glasgow Dep. at 17:17-18:17; 72:7-17; _see also_, Ex. K, Explanation of Review, dated February 5, 2016, March 2, 2016, and April 1, 2016.

65.     Nationwide's adjuster, Kristin Cobb sent an Explanation of Review document to Emergency Care, with a received date of Feb. 3. 2016. _See_ Ex. H, Glasgow Dep. at 28:2-29:8; _see also_, Ex. K, Explanation of Review, dated February 5, 2016. Specifically, the document listed the reimbursement amount as $0.00 and stated under Explanation for the Review Amount: "[i]n order to make a reimbursement decision, documentation is needed to support the medical necessity for continued care or treatment." _See_ Ex. K, Explanation of Review, dated February 5, 2016 at p. 2.

66.     Because the bill was not processed for payment due to the missing records, Nationwide and/or AIS also never calculated the amount to be reimbursed to Emergency Care after applying the Act 6 reduction. _See_ Ex. H, Glasgow Dep. at 72:7-17; _see also_, Ex. K, Explanation of Review documents.

67.     As reflected in the PIP Log, Nationwide reimbursed several of Plaintiff's other medical providers that submitted bills for reimbursement under Plaintiff's Policy. _See_ Ex. L, PIP Log; _see also_, Ex. H, Glasgow Dep. at 18:20-19:11; 22:9-16.

68.     As of February 3, 2016, Nationwide had paid out the full amount of **$5,000.00** in First Party Benefits (or PIP benefits) that Plaintiff had available under her Nationwide Policy. *See* Ex. L, Pip Log; *see also*, Ex. H, Glasgow Dep. at 18:20-19:11; 22:9-16.

69.     As a result, Nationwide had no responsibility under the Nationwide Policy as of February 3, 2016 to make payment to any of Plaintiff's other medical providers, including Emergency Care, on Plaintiff's behalf after her benefits were exhausted . *See* Ex. H, Glasgow Dep. at 32:2-33:20; *see also*, Ex J, Nationwide Policy at pp 2, F5.

70.     Therefore, Nationwide issued a second Explanation of Review document to Emergency Care, which also had a received date of Feb. 3. 2016. This Explanation of Review document also listed the reimbursement amount as $0.00 and stated under Explanation for the Review Amount: "**[t]he benefits for this patient/claim are exhausted.**" *See* Ex. K, Explanation of Review, dated April 28, 2016 at p. 2; *see also*, Ex. H, Glasgow Dep. at 31:4-32:18.

71.     According to Nationwide, Plaintiff would have also received a copy of an Explanation of Benefits document from Nationwide including the same information. *See* Ex. H, Glasgow Dep. at 35:9-13.

72.     Again, because the bill was denied by Nationwide due to Plaintiff's benefits being exhausted, Nationwide and/or AIS also never calculated the amount to be reimbursed to Emergency Care after applying the Act 6 reduction. *See* Ex. H, Glasgow Dep. at 71:14-25; *see also*, Ex. K, Explanation of Review, dated April 28, 2016 at p. 1.

73.     On April 19, 2016, Emergency Care resubmitted the requisite Insurance Claim Form to Nationwide along with the requested medical records attached. Ex. F, Insurance Claim Form, dated April 19, 2016.

74.     However, Nationwide still did not pay the $900.00 bill because at that time Plaintiff's first-party medical benefits were exhausted. _See_ Ex. H, Glasgow Dep. at 32:21-33:20.

75.     Once again, Nationwide and/or AIS also did not perform the Act 6 reduction on behalf of Nationwide for the $900.00 bill from Emergency Care because the $5,000 in first-party medical benefits were exhausted. _Id._ at 72:18-22.

76.     Emergency Care resubmitted the Insurance Claim Form to Nationwide for payment of the $900.00 bill on multiple additional occasions, but the bill was never paid by Nationwide because Plaintiff exhausted her $5,000 first-party medical benefits. _Id_. at 17:9-18:10; 22:17-23:23; Ex. L, PIP and Medical Payments Log.

77.     The PIP Log produced by Nationwide reflects that the $900.00 bill was submitted by the provider for payment by Nationwide on at least six (6) different occasions, but it was never paid. _See_ Ex. L.

78.     Nationwide also issued an Explanation of Review document to Emergency Care, which stated that reimbursement was denied and provided an explanation of "duplicate." _See_ Ex. K, Explanation of Review, dated December 7, 2016 at p. 2. However, Ms. Glasgow confirmed that this was not the reason why Nationwide denied payment of the $900.00 charge and that she believed that the Explanation of Review form was automatically generated. _See_ Ex. H, Glasgow Dep. at 40:21-41:19.

79.     Once the $5,000 coverage limit in First Party Medical benefits under Plaintiff's Policy were exhausted, the medical portion of Plaintiff's claim was closed out. _See_ Ex. H, Glasgow Dep. at 36:13-20.

80.     Nationwide never paid the $900.00 bill from Emergency Care for Plaintiff's treatment in the Emergency Room at Nazareth Hospital on Nov. 2, 2015. _Id_. at 33:15-20.

81.     After submitting her claim to Nationwide, Plaintiff claims she informed the medical claims adjuster that she had been treated at the Emergency Room at Nazareth Hospital for injuries she sustained in the accident. Ex. A., Byfield Dep. at 23:16-20.

82.     According to records from Nationwide, Plaintiff was informed by Nationwide's adjuster that her medical insurance benefits were exhausted under her Policy and that Nationwide would be closing the medical portion of her claim. _See_ a copy of Kristin Cobb's Log Notes produced by Nationwide, attached hereto as **Exhibit "M"** at **p.1**.

83.     On February 5, 2016, Kristen Cobb from Nationwide noted that she "[s]poke with Hermine and informed her that her benefits have been exhausted, so we can close her medical claim. She was agreeable. Will send PIP and letter." _Id._

84.     Ms. Glasgow confirmed that an Explanation of Benefits form would have been sent to Plaintiff by Nationwide, also informing her that the $900.00 bill from Emergency Care was not paid by Nationwide because her benefits were exhausted. Ex. H, Glasgow Dep. at 24:23-25:8; 31:4-32:18.

**D.      HRRG's Efforts to Attempt to Collect the Unpaid $900 Debt owed by Plaintiff**

85.     On or about March 20, 2017, Healthcare Revenue Recovery Group ("HRRG") was assigned to attempt to recover payment of the unpaid $900.00 bill for Plaintiff's treatment on Nov. 2, 2015 on behalf of the provider, Emergency Care. _See_ a copy of the deposition transcript of HRRG's Rule 30(b)(6) witness, Kevin Metzger, dated November 1, 2021, attached hereto as **Exhibit "N"** at 134:10-136:5; _see also_, a copy of HRRG's Account Notes attached hereto as **Exhibit "O"** at p. 1.

86.     HRRG's VP of Operations, Kevin Metzger, testified that when HRRG receives an account for recovery of an unpaid medical bill that it is assumed that the client has determined that

the debtor or patient is "self-pay" and does not have automobile insurance available to pay the charge. *See* Ex N, Metzger Dep., at 63:7-19; 78:3-23.

87.     HRRG relies upon the client, who is the medical billing provider, to ensure compliance with the Motor Vehicle Laws that may be applicable in their respective jurisdiction. *Id.* at 250:19-24; 356:24-357:4.

88.     Mr. Metzger further explained that HRRG properly sends a validation notice to the debtor/patient in HRRG's initial correspondence requesting that the debtor/patient provide written notice to HRRG that he or she disputes the validity of the debt within thirty (30) days or else HRRG assumes that the debt is valid. *Id*. at 65:10-66:12.

89.     In the event that HRRG receives written notice from the debtor/patient that they are disputing the validity of the debt, then HRRG's policy is to stop collection activities and to refer the dispute to the client, so that the matter may be further investigated. *Id*. at 67:16-68:17.

90.     HRRG's policy was consistent with HRRG's understanding of the requirements of the FDCPA. *Id*. at 247:10-17; 251:10-20; 320:21-323:4; 362:6-19.

91.     HRRG's employees receive training on the requirements of the FDCPA, including by attending a training seminar created by ACA International, which is an association of credit and collection professionals founded in 1939 that offers training for compliance with federal laws governing third-party debt collectors. *Id*. at 247:10-17; 248:18-23; 249:22-250:5; 338:3-7; 362:6-19; *see also*, http://www.acainterantional.org/about/ (last accessed 12/7/21).

92.     HRRG maintains written policies and procedures to ensure compliance by employees with the FDCPA's requirements, as well as provides periodic updates to employees based on changes in the law. *Id*. at 241:3-243:2; 251:10-20; 362:8-19; *see also*, copies of relevant

FDCPA policy documents and memoranda produced by HRRG attached hereto as **Exhibit "P"**, bates labeled HRRG 00000049-00000053; 00000057-00000058.

93.     HRRG does not maintain written policies specifically for compliance with the Motor Vehicle Financial Responsibility Law ("MVFRL") because HRRG is not a medical provider and relies upon its clients to ensure compliance with the Motor Vehicle Laws in their respective jurisdictions. *See* Ex N, Metzger Dep., at 250:10-24.

94.     HRRG's policies require its employees to update HRRG's account records if HRRG is advised that a patient/debtor has auto insurance available that may be applicable to pay the charge HRRG is seeking to collect. *Id.* at 220:22-246:23.  Once HRRG's employees update the account with the auto insurance information provided, then the information is automatically transmitted to HRRG's client in order for the client to seek payment from the auto insurer, if appropriate. *Id*. at 139:18-140:3; 293:5-17.

95.     On March 21, 2017, HRRG sent a validation notice to Plaintiff informing her that Emergency Care had hired HRRG to collect the $900.00 balance from November 2, 2015. *See* a copy of letters from HRRG to Plaintiff, dated Mar. 21, 2017, April 26, 2017, June 1, 2017 and Aug. 3, 2017, attached hereto as **Exhibit "Q"**.[2]

96.     Consistent with HRRG's validation policy, HRRG's March 21, 2017 letter included the following statement:

> Unless you notify this office within 30 days after receiving notice that you dispute the validity of this debt, or any portion thereof, this office will assume this debt is valid. If you notify this office in writing within 30 days after receiving this notice that you dispute the validity of this debt, or any portion thereof, this office will obtain verification of the debt or obtain a copy of a judgment and mail you a copy of such judgment or verification. If you request of this office in writing within 30

---

[2] Plaintiff has not brought a FDCPA claim against HRRG for any correspondence and/or communications by HRRG other than the Aug. 3, 2017 letter identified in her Complaint. *See generally*, Compl. [ECF 1].

days after receiving this notice this office will provide you with the name and address of the original creditor, if different from the current creditor.

*See id*. at HRRG 00000032-00000033.

97.     HRRG's March 21, 2017 letter was sent to Plaintiff's mailing address at 6605 Oakland Street, Philadelphia, PA 19149-2230.  *Id*.

98.     HRRG never received anything in writing from Plaintiff following HRRG's March 21, 2017 letter informing HRRG that Plaintiff was disputing the validity of the debt that HRRG was seeking to collect. *See* Ex N, Metzger Dep., at 80:17-82:3; .

99.     Plaintiff admits she previously resided at the address where the March 21, 2017 letter was delivered, but claims she never received it. *See* Ex. A, Byfield Dep.at  9:12-17; 54:11-55:1.

100.    Plaintiff claims the only letter she ever received from HRRG was the letter dated August 3, 2017 identified in the Complaint. *Id*. at 55:14-18.

101.    HRRG attempted to reach Plaintiff via telephone on more than one occasion, but Plaintiff testified she never received any telephone calls from HRRG. *See* Ex. O, HRRG's Account Notes, at pp. 4-6; *see also*, Ex N, Metzger Dep, at 156:19-157:10; 159:1-6.

102.    HRRG's Account Notes reflect that Plaintiff called HRRG apparently after receiving HRRG's Mar. 21, 2017 letter via telephone on Mar. 31, 2017. *See* Ex. O, HRRG's Account Notes, at HRRG0000044 (reflecting an "inbound call" on Mar. 31, 2017).

103.    HRRG produced an electronic copy of a recorded telephone call from Plaintiff to one of HRRG's employees, which is attached hereto as **Exhibit "R"**.

104.    Plaintiff is unable to recall when she called HRRG, but admitted that she is the person recorded on the phone call. *See* Ex. A, Byfield Dep. at 56:19-59:3.

105. Plaintiff testified that she had received a letter from HRRG regarding the $900.00 charge by Emergency Care, which is what prompted her to call HRRG. *Id*. at 55:7-21.

106. At the request of the HRRG employee, Plaintiff provided the validation notice number which was included at the top of the March 21, 2017 letter from HRRG. Ex. R.

107. During the telephone call, Plaintiff became upset with the HRRG employee and claimed that the $900.00 bill had been paid by her auto insurance carrier, Nationwide. *Id*.

108. HRRG's employee asked Plaintiff during the recorded telephone call if she was able to provide an Explanation of Benefits document from her auto insurance company verifying the bill was paid by the auto insurer, but she refused. *Id*.

109. Plaintiff then said that she was going to contact Nationwide because "someone was not doing [their] jobs." *Id*. Plaintiff then hung up. *Id*.

110. At the time of Plaintiff's telephone call, HRRG had been made aware by its client that the provider had submitted the $900.00 bill to Nationwide for payment, but that Nationwide had refused to pay it. *See* Ex N, Metzger Dep., at 87:9-15.

111. Plaintiff never contacted HRRG again after her phone call. *See* Ex. A, Byfield Dep., at 61:3-6.

112. Plaintiff testified that after her call to HRRG, she provided a copy of the letter she received from HRRG that prompted her telephone call to HRRG to her attorney, Eric Rayz, Esq. of Kalikhman & Rayz, LLC, who is also representing her in this current action. *Id*. at 53:5-11.

113. Plaintiff retained Kalikhman & Rayz, LLC to represent her shortly following her auto accident on Nov. 2, 2015. *Id*. at 46:18-47:18.

114. Plaintiff also called Nationwide following her telephone call to HRRG about the $900.00 charge from Emergency Care. *See* Ex. A, Byfield Dep., at 59:22-60:5.

115. On April 10, 2017, Brittany Shirk from Nationwide "[r]eceived a call from [Hermine Byfield, who] was upset insisting that the bill for $900 should have been [paid]." *See* a copy of Log Notes from Brittany Shirk produced by Nationwide in response to HRRG's Subpoena, dated Apr. 10, 2017, attached hereto as **Exhibit "S"**.

116. Ms. Shirk tried "explaining that [Plaintiff's] benefits were exhausted" but Plaintiff "insisted that this bill should have been [paid] because she had called before about this same bill." *Id*. at 2.

117. HRRG sent additional letters to Plaintiff on April 26, 2017 and June 1, 2017 at the same mailing address with regard to the $900.00 debt owed to Emergency Care that remained unpaid. *See* Ex Q, HRRG's Letters to Plaintiff, dated April 26, 2017 and June 1, 2017, at HRRG 00000034-00000037.

118. Plaintiff claims she did not receive the April 26, 2017 and June 1, 2017 letters. *See* Ex. A, Byfield Dep., at 55:7-21; 56:8-12.

119. Plaintiff did not contact HRRG as requested in response to HRRG's April 26, 2017 and June 1, 2017 letters. *Id*. at 56:13-18.

120. On Aug. 3, 2017, HRRG sent a letter to Plaintiff regarding payment of the $900.00 charge by Emergency Care. *See* Ex. Q, HRRG's Aug. 3, 2017 Letter, at HRRG 00000038-00000039; Ex. A, Byfield Dep. at 47:19-48:1.

121. HRRG's letter of Aug. 3, 2017 was also addressed to Plaintiff at 6605 Oakland Street, Philadelphia, PA 19149-2230, which is the same mailing address that each of HRRG's three previous letters had been sent. *See* Ex. Q at HRRG 00000034-00000039.

122. The Aug. 3, 2017 letter from HRRG notified Plaintiff that she had an outstanding balance with Emergency Care for $900.00. *See id.*, HRRG's Aug. 3, 2017 Letter, at HRRG 00000038-00000039.

123. The letter also notified Plaintiff that she could "settle [her] balance of $900.00 by making a one-time payment of $540.00 within 14 days of the date of this letter." *Id.*

124. Unlike HRRG's three previous letters sent to the same mailing address, Plaintiff testified that she did receive HRRG's Aug. 3, 2017 letter. *See* Ex. A, Byfield Dep. at 55:7-21.

125. After receiving HRRG's Aug. 3, 2017 letter, Plaintiff provided a copy of the letter to her attorney. *Id.* at 53:5-11.

126. On or about Aug. 18, 2017, HRRG's Account Notes reflect that HRRG received a letter from Plaintiff's attorney via facsimile advising he was representing Plaintiff and informed HRRG that she had automobile insurance available through Nationwide. *See* Ex. O, HRRG's Account Notes, at HRRG 0000046.

127. In accordance with HRRG's policies, HRRG's Account Notes reflect that HRRG promptly submitted this information to its client and immediately stopped all collection efforts on the account. *See id.*; *see also*, Ex N, Metzger Dep., at 168:15-170:7.

128. HRRG received no further contact from Plaintiff and/or her counsel until the filing of this lawsuit. *See* Ex. O, HRRG's Account Notes; *see also*, Ex N, Metzger Dep., at 81:9-18.

**E.      Plaintiff's Auto Accident Lawsuit filed in State Court Against the "At Fault" Driver and Nationwide for Unpaid UM/UIM Benefits**

129. On Aug. 30, 2017, through the assistance of her current counsel, Plaintiff filed a lawsuit in the Philadelphia Court of Common Pleas against Desirae Schullere Douglas, PV Holding Corporation and Nationwide ("PCCP Complaint"). *See* Ex. B, PCCP Compl.; Ex. A, Byfield Dep., at 46:18-23; Ex. C, Lanes Dep. at 8:17-9:12.

130.     In her PCCP Complaint, Plaintiff asserted claims against Nationwide for wrongfully failing to pay Uninsured Motorist benefits and Underinsured Motorist benefits that Plaintiff alleged that she was entitled to for the auto accident on Nov. 2, 2015 under Nationwide's Policy. *See* Ex. B, PCCP Compl. at ¶¶ 29-37, 38-46; *see also*, Ex. A, Byfield Dep., at 46:18-23; Ex. C, Lanes Dep. at 17:12-22.

131.     Nationwide did not receive notice prior to the filing of Plaintiff's lawsuit in state court that Plaintiff was making a claim for UM or UIM benefits under her Policy. *See* Ex. C, Lanes Dep. at 8:24-9:12.

132.     Nationwide filed an Answer denying that it had failed to comply with the terms of Nationwide's Policy by failing to pay Uninsured Motorist benefits and Underinsured Motorist benefits to Plaintiff. *See* a copy of Nationwide's Answer to the PCCP Complaint attached hereto as **Exhibit "T"** at ¶¶ 29-37, 38-46; *see also*, Ex. C, Lanes Dep. at 18:15-19:12.

133.     Nationwide also asserted that Plaintiff's claims for allegedly unpaid UM and UIM benefits were barred by the terms of the Policy, and that Nationwide had performed all duties and obligations pursuant to the Policy. *See* Ex. T, Nationwide's Answer, at ¶¶ 49-50.

134.     Nationwide further asserted that Plaintiff's claimed injuries did not exceed the insurance policy limits of the tortfeasor. *Id.* at ¶ 51.

135.     Nationwide did not pay Uninsured Motorist benefits to Plaintiff because Plaintiff's UM coverage was only triggered if the other driver was determined to be "at fault" and had no other insurance available. *See* Ex. C, Lanes Dep. at 34:4-18.

136.     Nationwide also did not agree to pay Underinsured Motorist benefits to Plaintiff because Plaintiff's UIM coverages were only triggered if the other driver was determined to be "at

fault" and had inadequate insurance available to compensate Plaintiff for her damages. *Id.* at 13:15-14:5.

137.     The other driver involved in the auto accident, Desirae Schullere Douglas, never responded to the PCCP Complaint, and Plaintiff subsequently obtained a default judgment against Ms. Douglas on December 14, 2017. *See* a copy of the Arbitration Award, dated June 8, 2018, attached hereto as **Exhibit "U"**; *see also*, Ex. C, Lanes Dep. at 17:23-18:3; 36:15-20.

138.     Nationwide never determined if the other driver had personal auto insurance available that might provide coverage for Plaintiff's accident. *See* Ex. C, Lanes Dep. at 18:8-12.

139.     Following the initiation of Plaintiff's lawsuit in state court, Nationwide investigated whether the rental car company that owned the vehicle being operated by the "at fault" driver at the time of the accident had other available auto insurance before determining if Plaintiff was entitled to UM or UIM coverage under her Policy. *Id.* at 34:4-36:1. However, the rental car company's auto insurer denied coverage. *Id.*

140.     Plaintiff, through her counsel, also attempted to make a claim for coverage with the rental car company's automobile insurer, but the carrier also denied Plaintiff's request for coverage because another third-party had rented the vehicle and Ms. Schullere Douglas was not authorized to operate the vehicle. *See* a copy of a letter from Sedgwick Claims Management Services, Inc. to Attorney Rayz, dated Jan. 2, 2019, attached hereto as **Exhibit "V"**; *see also*, Ex. A, Byfield Dep., at 66:23-67:16.

141.     On June 8, 2018, an arbitration hearing was held in connection with Plaintiff's lawsuit in Philadelphia County, Pennsylvania, and a Report and Award of Arbitrators was issued that same date. *See* Ex. U, Report and Award of Arbitrators; *see also*, Ex. C, Lanes Dep. at 36:10-37:14.

142.     The arbitration panel assessed damages in favor of Plaintiff and against Ms. Douglas in the amount of Fifteen Thousand Dollars ($15,000), who was defaulted in December 2017. *See* Ex. U, Report and Award of Arbitrators; *see also*, Ex. C, Lanes Dep. at 36:10-37:14.

143.     However, the arbitration panel found in favor of Nationwide and the rental car company, PV Holdings Corporation, and against Plaintiff on all Counts. *See* Ex. U, Report and Award of Arbitrators; Ex. C, Lanes Dep. at 36:10-37:14.

144.     Plaintiff appealed the arbitration panel's decision for a civil trial *de novo* in accordance with 42 Pa .C.S. § 7361. Ex. C, Lanes Dep. at 38:20-25.

145.     There was never a judicial determination that Nationwide was required under Nationwide's Policy to pay Plaintiff UM and/or UIM coverage benefits in relation to the auto accident on Nov. 2, 2015. *See* Ex. C, Lanes Dep. at  31:25-32:7.

146.     Before the case reached a civil trial *de novo*, in January 2019, Nationwide agreed to a settlement with Plaintiff in order to resolve her claims against Nationwide in the lawsuit. *See* a copy of the General Release executed by Plaintiff, dated Jan. 24, 2019, attached hereto as **Exhibit "W"**; *see also*, Ex. A, Byfield Dep. at 74:19-75:19; Ex. C, Lanes Dep. at 21:9-16; 46:13-47:4.

147.     Plaintiff executed a General Release in favor of Nationwide, dated Jan. 24, 2019, a true and correct copy of this is attached hereto as Exhibit "W".  *See* Ex. W.

148.     The General Release provided that Plaintiff would receive payment of the sum of Thirteen Thousand Dollars ($13,000) as consideration for the settlement of her claims against Nationwide. *Id*. at p. 1.

149.     The General Release further provided that Plaintiff and Nationwide "acknowledged that the payment of this consideration is made as a settlement of a **disputed claim** and to avoid the further costs and risks of protracted and uncertain litigation, and is **not an admission of liability**

on the part of [Nationwide], it being understood that [Nationwide] denies such liability." *Id*. (emphasis added).

150. The rental car company's insurance carrier had denied coverage for Plaintiff's accident on Nov. 2, 2015, which Nationwide determined triggered Plaintiff's UM benefits under her Policy. Ex. C, Lanes Dep. at 34:19-35:9.

151. Plaintiff was paid the sum of Thirteen Thousand Dollars ($13,000) by Nationwide as agreed to under the terms of the settlement between Plaintiff and Nationwide. *See*, Ex. A, Byfield Dep. at 75:5-15; Ex. C, Lanes Dep. at 40:18-23; 51:21-24.

152. After Nationwide paid Plaintiff the above settlement of Thirteen Thousand Dollars ($13,000), according to Nationwide, it would have been Plaintiff's responsibility to satisfy any unpaid medical bills for her treatment in relation to the accident on Nov. 2. 2015 from the settlement proceeds. *See* Ex. C, Lanes Dep. at 38:11-19.

153. Under Nationwide's Policy, any UM or UIM benefits are paid directly to the Insured in one lump sum. Ex. C, Lanes Dep. at 38:5-16.

154. Once Nationwide has fully paid the amount determined to be owed for UM or UIM benefits to the Insured, the Insured would be responsible for satisfying any unpaid medical bills. *Id*.. at 38:5-16.

155. Nationwide would not pay the Insured's medical providers directly when paying a claim for UM or UIM benefits. *Id*. at 38:17-19.

156. Nationwide never received a request from Plaintiff and/or her counsel to pay the $900.00 charge from Emergency Care for Plaintiff's treatment in the Emergency Room at Nazareth Hospital on No. 2. 2015 under Plaintiff's UM or UIM coverage. *Id*. at 24:16-25:3.

157.    If Plaintiff had paid any medical bills directly and submitted a claim for out-of-pocket expenses incurred paying medical bills in relation to the auto accident on Nov. 2, 2015 to Nationwide, then Nationwide would have reimbursed Plaintiff once it was determined that she was entitled to UM or UIM benefits. *Id*. at 13:1-14.

### F.    Plaintiff's Damages

158.    Plaintiff testified she does not believe she incurred any economic damages, such as out-of-pocket expenses, as a result of HRRG's actions. Ex. A, Byfield Dep. at 77:10-16.

159.    Plaintiff has produced no evidence that HRRG's actions caused her to suffer any economic damages.

160.    Plaintiff has no knowledge if HRRG's actions impacted her credit report. *Id*. at 78:9-24.

161.    Plaintiff has produced no evidence that HRRG's actions impacted her credit score.

162.    Plaintiff did not seek any medical treatment and/or mental health treatment for any injuries she is claiming to have suffered due to HRRG's actions. *Id*. at 77:17-24; 79:2-12.

163.    Plaintiff testified that she was upset during the phone call with HRRG's employee, but admitted that she is not claiming any emotional harm resulting from HRRG's actions in attempting to collect the $900.00 bill. *Id*. at 79:2-7.

164.    Plaintiff testified in response to questioning by her attorney that the resolution of her lawsuit in state court was delayed due to the dispute over Emergency Care's bill of $900.00, but on redirect could not explain how the lawsuit was delayed. *Id*. at 88:3-22.

165.    Plaintiff has produced no evidence that HRRG's actions caused her to suffer any actual damages recoverable under the FDCPA.

**MARKS, O'NEILL, O'BRIEN,**
**DOHERTY & KELLY, P.C.**

***/s/ Cecil J. Jones, Esquire***
Cecil J. Jones, Esquire (Atty ID 205952)
One Penn Center
1617 John F. Kennedy Boulevard
Suite 1010
Philadelphia, Pennsylvania 19103
(215) 564-6688
cjones@moodklaw.com
Attorney for Defendant,
Healthcare Revenue Recovery Group, LLC

Date: December 14, 2021