# EXHIBIT A

```
 1              UNITED STATES DISTRICT COURT
          FOR THE EASTERN DISTRICT OF PENNSYLVANIA
 2
    HERMINE BYFIELD,                )
 3            Plaintiff,            )Civil Action
                                    )
 4       vs.                        )No. 2:18-CV-00243-PBT
                                    )
 5  HEALTHCARE REVENUE RECOVERY     )
    GROUP, LLC; and DOES 1 through  )
 6  10, inclusive,                  )
              Defendants.           )
 7  _____

 8

 9

10                  HERMINE BYFIELD

11

12            Remote videotaped videoconference
    deposition of Hermine Byfield taken in the above
13  matter on Wednesday, September 29, 2021, with the
    witness participating via videoconference while
14  physically located at Kalikhman & Rayz, LLC, 1051
    County Line Road, Suite A, Huntingdon Valley, PA
15  19006, commencing at 10:30 a.m.

16            Stenographically recorded and
    transcribed by Lisa Taylor, Registered Professional
17  Reporter and notary public (participating via
    videoconference).
18                      _ _ _

19

20

21

22

23

24

25
```



```
 1                          — — —

 2                    A P P E A R A N C E S

 3   On behalf of the Plaintiff:

 4        KALIKHMAN & RAYZ, LLC
          BY:  ARKADY "ERIC" RAYZ, ESQ.
 5        1051 County Line Road
          Suite A
 6        Huntingdon Valley, PA 19006
          (215)792-2963
 7        erayz@kalraylaw.com
          (participating via videoconference)
 8

 9   On behalf of the Defendant Healthcare Revenue
     Recovery Group, LLC:
10
          MARKS, O'NEILL, O'BRIEN, DOHERTY & KELLY, PC
11        BY:  CECIL J. JONES, ESQ.
          One Penn Center
12        1617 John F. Kennedy Boulevard
          Suite 1010
13        Philadelphia, PA 19103
          (215)564-6688
14        cjones@moodklaw.com
          (participating via videoconference)
15

16

17

18

19

20

21

22

23

24

25
```



```
 1              E X A M I N A T I O N    I N D E X
 2
    WITNESS:                                         PAGE:
 3  Hermine Byfield
        Examination by Mr. Jones                        5
 4      Examination by Mr. Rayz                         81
        Further Examination by Mr. Jones               88
 5
 6
 7
 8              E X H I B I T    I N D E X
 9  EXHIBIT:    DESCRIPTION:                          PAGE:
        1       11/2/15 Nazareth ER Record               14
10      2       Nationwide Policy Declaration Pages      19
        3       2/20/18 Nazareth Patient Statement       25
11      4       Nationwide PIP and Medical Payments      28
                Log
12      5       Health Insurance Claim Form              33
        6       2/3/16 Explanation of Benefits           34
13      7       2/3/16 Explanation of Benefits           36
        8       Insurance Claim Form                     40
14      9       Complaint                                46
        10      8/3/17 Letter                            48
15      11      3/21/17 Letter                           54
        12      4/26/17 Letter                           55
16      13      6/1/17 Letter                            56
        14      Recorded Telephone Call                  61
17      15      Complaint                                62
        16      1/2/19 Letter                            66
18      17      Nationwide's Answer with New Matter      68
        18      Arbitration Award and Report             71
19
20
21
22
23
24
25
```



```
 1           (Remote videotaped videoconference
 2           deposition commences, 10:30 a.m.)
 3                      — — —
 4           (It was stipulated and agreed by and
 5   between counsel for the respective parties
 6   that the court reporter may remotely
 7   administer an oath/affirmation to the
 8   witness.
 9           It was stipulated and agreed by and
10   between counsel for the respective parties
11   that the witness will read and sign the
12   deposition and that the sealing and filing of
13   the deposition shall be waived.
14           It was further stipulated and agreed
15   by and between counsel for the respective
16   parties that all objections, except as to the
17   form of the question, be waived until the
18   time of trial.)
19                      — — —
20           VIDEOGRAPHER:  Good morning.  We're
21   now on the record.  The time is now
22   10:30 a.m. on Wednesday, September 29, 2021.
23           This begins the videotaped deposition
24   of Hermine Byfield taken in the matter of
25   Hermine Byfield versus Healthcare Revenue
```



1          Recovery Group, LLC, et al., filed in the

2          United States District Court for the Eastern

3          District of Pennsylvania, the case number of

4          which is 2:18-CV-00243-PBT.

5                    The videographer today is Randy

6          Wright.  The court reporter today is Lisa

7          Taylor.  We are both representing Esquire

8          Deposition Solutions.

9                    Counsel, will you please announce your

10         name and whom you represent, after which the

11         court reporter will swear in the witness.

12                   MR. JONES:  Good morning.  Cecil Jones

13         representing the Defendant, Healthcare

14         Revenue Recovery Group.

15                   MR. RAYZ:  Good morning.  Eric Rayz --

16                   THE WITNESS:  Good morning.  Oh.

17                   MR. RAYZ:  -- representing Hermine

18         Byfield.

19               (HERMINE BYFIELD was called and having

20                been duly sworn, was examined and

21                testified as follows:)

22                        EXAMINATION

23    BY MR. JONES:

24         Q.    Good morning, Ms. Byfield.  As I

25    introduced myself, my name is Cecil Jones.  I



1  represent one of the defendants in the case,

2  Healthcare Revenue Recovery Group.  For the

3  deposition, I'll may refer to my client as "HRRG."

4  Do you understand that's -- I'm referring to

5  Healthcare Revenue Recovery Group?

6         A.    Yes.  Good morning.  Um-hum.

7         Q.    Okay.  Have you ever given a

8  deposition before?

9         A.    Yes, um-hum.

10         Q.    Okay.  Can you just state your name

11  for the record?

12         A.    Hermine Byfield.

13         Q.    Okay.  And although you've given a

14  deposition before, I'm just going to go over some

15  instructions just so we're on the same page for

16  today's proceedings.

17              So you're testifying under oath.  I'm

18  going to ask you questions, and just testify

19  truthfully to the best of your ability.

20              As the court reporter reminded us,

21  we're conducting today's deposition remotely via

22  Zoom, and so it's very important that during the

23  course of the deposition that we allow one another

24  to finish our complete sentences before the other

25  person starts to talk.  So if you can allow me to

 1  finish my entire question and then you can give a

 2  response.  Otherwise, the mikes cut out and the

 3  court reporter will have difficulty typing

 4  everything down.  Do you understand that?

 5          A.    Yes, um-hum.

 6          Q.    Okay.  And we just want you to testify

 7  to the best of your ability.  If I ask you a

 8  question, you don't understand it or you're not able

 9  to hear me properly, let me know.  I'll either --

10  I'll try to restate or rephrase the question.

11              If you do give a response, I'll just

12  assume that you understood the question that I

13  asked.  Okay?

14          A.    Okay.

15          Q.    You also have to give -- make sure

16  you're giving verbal responses like you've been

17  doing.  So "yes" or "no."  You can't shake your head

18  or say "um-hum" or "un-nuh," because the court

19  reporter can't interpret that.

20              If you don't know the answer to a

21  question, it's perfectly acceptable to say "I don't

22  know" or you don't recall.  We don't want you to

23  guess or speculate.

24              If you are giving, like, an

25  approximation or an estimate, just let us know that



1  you're doing that.  Okay?

2              I don't think that we'll be terribly

3  long today.  If at some point you need to take a

4  break, you just let us know.  We'll be glad to

5  accommodate you.  And just ask if we can answer --

6  if you can answer the question, if there's one

7  pending, before we take the break, and then we'll

8  come back on the record.  Okay?

9        A.    Okay.  Yes, um-hum.

10       Q.    Okay.  Is there anything -- you know,

11  are you taking any medication or anything like that

12  that you think will affect your ability to testify

13  truthfully today?

14       A.    No.

15       Q.    Okay.  And did you do anything to

16  prepare for today's deposition other than meet --

17  perhaps meet with your attorney?

18       A.    That's it, yes.

19       Q.    Okay.  Okay.  Can you give me your

20  current address?

21       A.    My -- 1126 Englewood Street,

22  Philadelphia, PA 19111.

23       Q.    Okay.  And how long have you lived at

24  that address?

25       A.    About two and a half years now.



1          Q.      Okay.  And did you at some point in

2    time live at 9200 Bustleton Avenue, Apartment 405 in

3    Philadelphia?

4          A.      Yes, um-hum.

5          Q.      Okay.  Were you residing at that

6    address at the time of the auto accident you were

7    involved in on November 2, 2015?

8          A.      Yes.

9          Q.      Okay.  How long did you live at that

10   address?

11         A.      I think it was one year.

12         Q.      Okay.  And had -- did you ever reside

13   at 6605 Oakland Street, Philadelphia, PA?

14         A.      Yes.

15         Q.      Okay.  And how long did you live at

16   that address?

17         A.      It's a year and a half.

18         Q.      Okay.  Did you live at any other

19   addresses other than the three you've listed since

20   the auto accident in 2015?

21         A.      Yes.

22         Q.      Okay.  Can you give me those

23   addresses?

24         A.      At 3017 Cottman Avenue, Philadelphia,

25   PA.  ZIP, 1911 -- 19149.

```
1          Q.      Okay.  How long did you live there?
2          A.      For a year.
3          Q.      Okay.  Anywhere else that you have
4    resided during -- since the auto accident?
5          A.      Yes.  But I totally forgot the -- the
6    one after Cottman, but I moved from there back to
7    Bustleton, which is 9200 Bustleton Avenue, and then
8    from Bustleton to where I'm residing right now.
9          Q.      Okay.  And are you married?
10         A.      Could you repeat that?
11         Q.      Are you married?
12         A.      No.  I'm single, um-hum.
13         Q.      Okay.  Do you have any children?
14         A.      Four.
15         Q.      Okay.  And how old are they?
16         A.      Thirty-one, 24, 21, and 17.
17         Q.      Okay.  Did any of your children reside
18   with you?
19         A.      Only the 17-year-old.  She's in
20   school.  Senior.
21         Q.      Okay.  And can you give me your date
22   of birth?
23         A.      October 10, 1967.
24         Q.      Okay.  And can you just describe for
25   me generally your educational background?
```



```
 1          A.     I graduated from high school.
 2          Q.     Okay.  When did you graduate from high
 3   school?
 4          A.     1985.
 5          Q.     Okay.  And have you had any other
 6   education since graduating from high school, like
 7   college or other types of schooling?
 8          A.     I was attending Jamaica School of
 9   Business in 1988, but I had to stop because of the
10   hurricane.
11          Q.     Okay.
12          A.     And when I came here, I went to -- I
13   did my class for -- my certification for nursing
14   assistants.
15          Q.     Okay.  And are you from Jamaica
16   originally?
17          A.     Yes, I am.
18          Q.     When did you move to the United
19   States?
20          A.     1992.
21          Q.     Okay.  And are you currently employed?
22          A.     Yes, I am.
23          Q.     Where are you employed?
24          A.     Einstein Hospital.
25          Q.     Okay.  And what do you do at Einstein?
```



1      A.      I'm a CNA, certified nursing

2  assistant, working with brain-injured patient.

3      Q.      Okay.  And how long have you worked at

4  Einstein?

5      A.      Five years now.  Still present.

6      Q.      Now, you were involved in an auto

7  accident on November 2, 2015, in Philadelphia

8  County; is that correct?

9      A.      Yes.

10      Q.      Okay.  And my understanding is that

11  accident occurred at the intersection of Bustleton

12  and Solly Avenues.

13      A.      That's correct, yes.

14      Q.      Okay.  Can you just generally describe

15  for me what happened?

16      A.      Yeah.  I was on -- I was at the gym,

17  on my way back from the gym, going home to 9200

18  Bustleton, driving on the right side, going towards

19  my house.

20              The opposite car coming from the other

21  end, which is on the -- the left-hand side, facing

22  me, driving right -- as soon as I reached the

23  intersection between Bustleton and Solly, all I

24  could see:  The car slide over, coming head-on right

25  into me.  That's all -- all I could say, "Lord have



1  mercy," and closed my eyes and the impact happened.

2          Q.      Okay.  And you were driving the

3  vehicle at the time?

4          A.      Yeah, yes.

5          Q.      Okay.  Did you have any passengers?

6          A.      No.  It was -- I was by myself.

7          Q.      And was the vehicle you were driving a

8  2014 Nissan Rogue?

9          A.      That's correct, yes.

10         Q.      Okay.  And the other driver, was her

11 name Desirae Schullere Douglas?

12         A.      I think so.  I don't remember quite

13 correct what was her name.

14         Q.      Do you know if the vehicle that the

15 other driver was driving was a rental car?

16         A.      No, I don't know.

17         Q.      Okay.  Did you sustain any injuries as

18 a result of the auto accident?

19         A.      Yes.  I sustained injury.  My back and

20 my -- my neck because of the impact in the front. It

21 was a head-on.

22         Q.      Okay.  And then did you receive

23 treatment for your injuries following the auto

24 accident at the emergency room at Nazareth Hospital?

25         A.      Yes.  They treated me for the pain and

1  because I was -- what they call if -- I think they

2  X-rayed me, too, and they gave me pain pill because

3  of the pain, the impact from what I did receive at

4  the accident from there, um-hum.

5        Q.    Okay.  Do you recall the name of the

6  doctor that treated you at the ER?

7        A.    That, I don't remember.

8        Q.    Okay.  I'm going to show you a

9  document.  We'll mark this as Exhibit 1.

10             (Exhibit Number 1

11             marked for identification.)

12 BY MR. JONES:

13        Q.    Hermine, can you see the document I've

14  displayed via the share screen function?

15        A.    (Unintelligible).

16             MR. RAYZ:  Can you zoom in a little

17        bit?  We see it.  It's really small.

18             MR. JONES:  Yeah.  No problem.

19             THE WITNESS:  I need my glasses.

20             MR. RAYZ:  Or, Cecil, Attorney, if you

21        give me the Bate numbers, maybe we can print

22        it out and get it in front of her.

23             MR. JONES:  Yeah.  Hang on one second,

24        Eric.  It's -- I'm having a technical issue.

25             Sorry.  Sometimes when I open PDFs, it



1              takes a little while to --

2                     MR. RAYZ:  Okay.

3                     MR. JONES:  Let me see.  Let me try to

4         reopen that.

5                     Okay.  Let's try this again.

6                     Okay.  Can you see the document

7         displayed now, ma'am?

8                     THE WITNESS:  I still don't --

9                     MR. JONES:  You need it to be bigger?

10                    MR. RAYZ:  Yeah, if you can make it

11        bigger.  We -- I mean, we definitely see it.

12                    THE WITNESS:  Oh.

13                    MR. RAYZ:  There we go.  That's

14        better.

15                    MR. JONES:  There we go.  Okay.

16                    And it -- this was -- I don't have a

17        Bates number, Eric.  That's why I didn't

18        answer you.

19                    MR. RAYZ:  Okay.

20                    MR. JONES:  It's -- it was produced

21        with the medical records from Nazareth

22        Hospital.

23   BY MR. JONES:

24        Q.     All right.  What we marked as Exhibit

25   2 [sic], this is an emergency record note from



1   Nazareth Hospital for your treatment on November 2,

2   2015.  Do you see that, where it lists your name,

3   patient information at the top there?

4           A.     Um-hum.

5           Q.     Okay.  And the attending physician, do

6   you see in the middle, is Dr. Jojo Hammond?

7           A.     Okay.

8           Q.     Do you see that?

9           A.     Yes, um-hum.

10          Q.     Can you say "yes" -- "yes" or "no."

11          A.     Yes, yes.

12          Q.     Okay.  Does that refresh your

13  recollection?  Did Dr. Hammond treat you at the ER

14  when you went to Nazareth?

15          A.     Yes.  It was a guy, but I don't

16  remember his name, you know.

17          Q.     Okay.  You don't have any reason to

18  believe that it wasn't Dr. Hammond that treated you?

19          A.     I'm not going to say no.  I don't

20  know.  I don't remember his name.  I don't remember

21  his name.

22          Q.     Okay.  Were you ever aware if Dr.

23  Hammond was employed by a company called Emergency

24  Care Services of Pennsylvania, PC?

25          A.     No, I don't recall.



1          Q.     Had you ever heard of that company?

2          A.     No.

3          Q.     At the time of the accident, did you

4    maintain auto insurance on the vehicle that you were

5    traveling in?

6          A.     Yes.

7          Q.     Okay.  Was that through Nationwide

8    Insurance Company?

9          A.     That's correct, yes.

10         Q.     Okay.  Did you provide any information

11   regarding your auto insurance when you sought

12   treatment at the emergency room at Nazareth

13   Hospital?

14         A.     Yeah.  I told them I have auto

15   insurance and everything, um-hum.

16         Q.     Okay.  In the note here, under

17   "insurance information," it lists -- do you see it

18   says "self-pay"?

19         A.     So self-pay would mean I would pay out

20   of pocket?

21         Q.     Well, I'm not sure.

22                Do you know why the hospital would not

23   have listed Nationwide Insurance in your treatment

24   notes?

25         A.     I don't know, because even with that,



1  I have insurance too different from the Nationwide

2  Insurance.  So it couldn't be self-pay.

3        Q.    Okay.  Do you remember, did you fill

4  out some paperwork in which you provided information

5  regarding your auto insurance policy through

6  Nationwide when you were admitted to the ER?

7        A.    I don't remember filling out

8  paperwork.

9        Q.    Did you -- is it possible you informed

10 someone at Nazareth Hospital after you were

11 discharged that you were insured by Nationwide?

12       A.    That, I don't remember either.

13       Q.    Okay.  Did you have private health

14 insurance at the time --

15       A.    Yes.

16       Q.    -- of the accident?

17       A.    Yes.

18       Q.    Who -- who was your health insurer?

19       A.    I was working at Pine Run.  I don't

20 remember if it was Blue Cross, but I was -- I had

21 insurance at that time, because I was employed.

22       Q.    Okay.  And that was through your

23 employer?

24       A.    Yes.

25       Q.    Who -- who was your employer at the



 1 | time?
 2 |      A.    Pine -- it was Pine Run Assisted
 3 | Living in Doylestown.
 4 |      Q.    Okay.  And are they located in
 5 | Philadelphia?
 6 |      A.    It's in Doylestown, PA.
 7 |      Q.    Okay.
 8 |           MR. JONES:  We'll mark this next
 9 |      document Exhibit 3.
10 |           MR. RAYZ:  Cecil, do you mean -- do
11 |      you mean 2?  Because that was the first one.
12 |           MR. JONES:  Oh, 2, right, yeah.
13 |      Sorry.  Thank you.
14 |           MR. RAYZ:  That's okay.  No, no, it's
15 |      okay.
16 |           (Exhibit Number 2
17 |           marked for identification.)
18 | BY MR. JONES:
19 |      Q.    Okay.  Let me share this one.
20 |           All right.  Ms. Byfield, this is --
21 | we've marked as Exhibit 2 -- it is a copy of your --
22 | the declaration pages for your -- your Nationwide
23 | auto policy that your attorneys produced in
24 | discovery.
25 |           Do you know -- it lists here the



1  policy period is August 29, 2015, to February 29,

2  2016, and then the policy number there.

3            Is that -- to the best of your

4  knowledge, this is the policy that you had in place

5  at the time of the auto accident?

6       A.    Yes, um-hum.

7       Q.    Okay.  Now, I just want to scroll down

8  here to the coverage page.  You -- you had two

9  vehicles insured by Nationwide; correct?

10      A.    Yes, um-hum.

11      Q.    Okay.  And who is Samantha Carroll?

12      A.    My daughter.

13      Q.    Okay.  And then the 2014 Nissan Rogue,

14  that was your vehicle?

15      A.    Yes.

16      Q.    Okay.  And it lists here that you had

17  first-party benefits, medical benefits $5,000.  Do

18  you see that?

19      A.    That's correct, yes, um-hum.

20      Q.    Okay.  And then also in addition to

21  other coverages for property damage and bodily

22  injury, do you see there's coverages for uninsured

23  motorist bodily injury and underinsured --

24      A.    Um-hum.

25      Q.    -- motorist bodily injury?



```
 1          A.      Um-hum.
 2          Q.      Okay.  And it looks like that's 15,000
 3   per each person and $30,000 per each occurrence;
 4   correct?
 5          A.      Yes, um-hum.
 6          Q.      Okay.  Now, did you make a claim to
 7   Nationwide following the auto accident under your
 8   policy?
 9          A.      Yes.
10                  MR. RAYZ:  (Unintelligible.)
11                  THE WITNESS:  Yes, um-hum.
12   BY MR. JONES:
13          Q.      Okay.  And did -- when did you make
14   your claim?
15          A.      I thought it was -- I think it was the
16   next day or -- I think it was the next day I called
17   them and let them know what happened, um-hum.
18          Q.      Okay.  The -- and Nationwide accepted
19   coverage for the auto accident claim?
20          A.      Yes, um-hum.
21          Q.      Did you obtain further medical
22   treatment for your injuries from the accident after
23   being discharged from the ER at Nazareth Hospital?
24          A.      Yes, um-hum.
25          Q.      Okay.  And after you submitted your
```



1  claim to Nationwide, were you assigned a claims

2  adjustor?

3          A.     Claim adjustor.  Yeah.  Like, someone

4  came out to look at my vehicle and stuff?

5          Q.     Well, were there people --

6  representatives from Nationwide that you worked with

7  after you submitted your claim?

8          A.     Yes.  She -- yeah.  I think she -- she

9  was in Harrisburg.  Someone called me from there,

10 yeah, um-hum.

11         Q.     Do you recall that person's name?

12         A.     I don't remember.

13         Q.     Okay.  Did they -- were there -- was

14 there more than one claims adjustor assigned, like,

15 one for the property damage and then one to handle

16 your medical portion of your claim?

17         A.     Yes, yes.

18         Q.     Do you remember who handled the

19 medical portion?

20         A.     I know it was a female, because I was

21 going back and forth with her.  Each time when I

22 receive a letter, I called her.

23         Q.     Was her first name Dawn?

24         A.     That's correct, yes, um-hum, um-hum.

25         Q.     You don't remember her last name?



```
 1          A.     I don't remember her last name.
 2   Because my sister's name is Dawn, so I remember,
 3   yeah --
 4          Q.     Okay.
 5          A.     -- um-hum.
 6          Q.     Did Nationwide's representative inform
 7   you to have your medical provider submit bills to
 8   them for payment for your --
 9          A.     No --
10          Q.     -- treatment?
11          A.     -- I don't recall that.  I don't
12   remember that.
13          Q.     Okay.  Did you submit any medical
14   bills directly to Nationwide for payment?
15          A.     No, I don't remember that either.
16          Q.     Did you informed Nationwide that you
17   had been treated at the ER at Nazareth Hospital
18   following the accident?
19          A.     Yeah.  I talked to Dawn, I think.  She
20   was the one doing the medical thing.
21          Q.     Okay.  And did Dawn inform you that
22   Nationwide would be paying for the expenses for your
23   medical care at the ER at Nazareth Hospital?
24          A.     I think she was the one going back and
25   forth with the hospital, because she told me that
```



1  she was getting in contact with the hospital and I

2  think ambulance service and all of that.

3        Q.     To your knowledge, did Nationwide pay

4  for all of the medical bills you incurred for your

5  treatment following the auto accident?

6        A.     Yeah, to my knowledge, yeah.

7        Q.     Did Nationwide ever refuse to pay any

8  of your medical bills that you incurred following

9  the auto accident?

10       A.     Not that I know of, no.

11       Q.     Okay.

12       A.     Not that I know of.

13       Q.     Do you know if the provider that

14 treated you at the ER at Nazareth Hospital submitted

15 a claim for payment of its bills to Nationwide?

16       A.     I don't know.

17       Q.     Okay.  Did you ever receive any

18 medical bills from Nazareth Hospital seeking payment

19 for medical treatment you received at the ER after

20 you were discharged?

21       A.     Yeah.  I received one, I think.  It

22 was from the company H something.

23              And that's when I called my lawyer and

24 asked them why did I receive this bill, and I -- I

25 faxed it over to the office, I think.



1      Q.      Now, is that the $900 bill that is at
2  issue in this lawsuit?
3      A.      That's correct, yes.
4      Q.      Okay.  Had you received any other --
5  well, let me ask you a different question.
6              Did -- did you receive any bills
7  directly from Nazareth Hospital before you received
8  the bill for $900 that you forwarded to your lawyer?
9      A.      No, I don't remember that.
10             MR. JONES:  Okay.  We'll mark this as
11        Exhibit 3.
12             (Exhibit Number 3
13             marked for identification.)
14  BY MR. JONES:
15     Q.      This appears to be a patient statement
16  that is addressed to you, Hermine Byfield, at -- and
17  this purports to be sent to 9200 Bustleton Avenue,
18  Apartment 407, in Philadelphia.  That was your
19  address at the time of the accident; right?
20     A.      That's correct, yes, um-hum.
21     Q.      Okay.  And you see on the right-hand
22  side, that lists providers Emergency Care Services
23  of Pennsylvania, PC?
24     A.      Um-hum.
25     Q.      Do you see that?



1          A.      Um-hum, yes, yes.

2          Q.      Yes, okay.

3          A.      Yes.

4          Q.      And then below in the patient

5    statement, there's a charge listed for $900 and the

6    provider is Dr. Jojo Hammond for an emergency

7    department visit on November 2, 2015.  Do you see

8    that?

9          A.      Yes, yes.

10         Q.      Okay.  And you never received a copy

11   of this patient statement?

12         A.      Not that one.  I don't remember

13   that -- recall that one, no.

14         Q.      Okay.  Did you ever receive any other

15   bills that appeared similar to this one that was

16   sent to you directly from Nazareth Hospital?

17         A.      Not from Nazareth.  It's -- the only

18   one I remember receive is the one with the HH

19   something.

20         Q.      That's HRRG?

21         A.      Yes.  That's the one I received in the

22   mail.

23         Q.      Okay.  Did you ever make any payments

24   for this $900 charge?

25         A.      No, I did not.



1        Q.     Okay.  Now, this statement is dated

2   February 20, 2018, and it shows the $900 charge

3   still remains unpaid.  Do you see that?

4        A.     Yes.

5        Q.     Okay.  Do you have -- do you -- are

6   you aware whether Nationwide ever actually paid the

7   $900 charge that you incurred for your treatment at

8   the emergency room at Nazareth Hospital?

9        A.     No, I don't.

10       Q.     Okay.  And other than -- other than

11   contacting your attorney, did you ever contact

12   anyone else after you received the letter from the

13   HRRG about this $900 bill?

14       A.     No, I don't remember.

15       Q.     Okay.

16       A.     Maybe.  Like I said, Dawn was the only

17   person at one time and that was it.

18       Q.     Okay.  So you may have contacted Dawn

19   at Nationwide but that was it?

20       A.     Yeah.  I called her, and she said -- I

21   think she said it was even paid, if I'm not

22   mistaken.  So I don't know.

23       Q.     Okay.  Do you recall when the -- you

24   received the letter from HRRG about the $900 bill?

25       A.     I think it was in what?  2017.



1      Q.     Okay.  And was it just one letter?

2      A.     It was one I can remember.

3      Q.     And what did Dawn say after you

4  contacted her about the bill?

5      A.     She was the one said she's going to

6  take care of -- going to call the hospital or

7  whosoever she was supposed to get in contact with.

8      Q.     Okay.  And did Dawn follow up with you

9  afterwards, after you had that conversation?

10      A.     I didn't hear nothing more.  I did not

11  hear nothing more, no.

12              MR. JONES:  Okay.  We'll mark this

13        next exhibit Exhibit 4.

14              (Exhibit Number 4

15              marked for identification.)

16              MR. JONES:  Can you see this document

17        on my screen okay, ma'am?  Do you need me to

18        make it bigger?

19              MR. RAYZ:  It's really small.

20              Hold on.  I -- I have it, actually.

21              MR. JONES:  Yeah, it's Nationwide 50

22        through 51.

23              MR. RAYZ:  Wait.  Hold on.

24              MR. JONES:  Let me see if I can make

25        it enlarged.



```
 1              Is that better?
 2              MR. RAYZ:  I -- I don't have -- I have
 3       the same one, except it doesn't have the
 4       Bates stamped numbers.
 5              MR. JONES:  Okay.  Well --
 6              MR. RAYZ:  Let me just pull it up for
 7       a second.  I want to make sure -- yeah, it's
 8       the same one, except it doesn't have the
 9       Bates stamp numbers.
10              So --
11              MR. JONES:  Okay.
12              MR. RAYZ:  -- we can see it on the
13       screen, and I'll put it in front of her.
14  BY MR. JONES:
15       Q.    Ma'am, I'll represent to you what we
16  marked as Exhibit 4, this is PIP and medical
17  payments log that was produced in response to a
18  subpoena that we served to Nationwide Insurance,
19  your auto insurance carrier, and it lists several
20  medical providers that it -- it appears provided you
21  treatment following your auto accident and charges
22  they incurred and submitted for payment to
23  Nationwide.  Do you see that?
24       A.    Um-hum.
25              MR. RAYZ:  Cecil, just give me one
```



HERMINE BYFIELD                                      September 29, 2021
BYFIELD vs HEALTHCARE REVENUE                                        30

```
 1          second.
 2                  MR. JONES:  Oh, okay.  Take your time.
 3                  MR. RAYZ:  No, the document --
 4                  MR. JONES:  Tell me when you're ready.
 5                  MR. RAYZ:  -- I have in front of her
 6          is not the one that you have, so I'm going to
 7          pull it back.
 8                  I have the earlier version of the PIP.
 9                  So please take a look at the screen.
10                  Go ahead.  I apologize.
11                  MR. JONES:  That's okay.
12   BY MR. JONES:
13          Q.     All right.  So on the left-hand side,
14   do you see there's service providers listed there
15   with dates of -- that they received these medical
16   bills, and then there are charges listed and paid
17   amounts listed on the right-hand side?  Do you see
18   that?
19          A.     Yes.
20          Q.     Okay.  Now, on -- I want to direct
21   your attention to the first one that it says
22   received date, February 3, 2016, and it lists Jojo
23   Hammond, and the billing provider is Emergency Care
24   Services of P -- Pennsylvania, PC, for your ER visit
25   on November 2, 2015, and the charge there is listed
```



1  as $900.  Do you see that?

2        A.    Yes, um-hum.

3        Q.    Okay.  And then the amount paid is

4  zero.  Do you see that?

5        A.    (Unintelligible.)

6              MR. RAYZ:  Hold on.  Cecil, give me

7        one sec.

8              Okay.  Go ahead.

9  BY MR. JONES:

10       A.    Yes, it said zero, um-hum.

11       Q.    Okay.  Now, and then there's some

12  additional entries, it looks like, for the same

13  provider, again $900 charge, zero payment, and then

14  there's another entry for December 5, 2016, for that

15  charge with zero payment.  Do you see that?

16       A.    Yes, um-hum.

17       Q.    Okay.  And then I want to scroll down.

18  It looks like at the bottom of the second page that

19  there are the same charge of $900 for Emergency Care

20  Services of Pennsylvania for your ER visit was

21  submitted to Nationwide on April 25, 2016 --

22       A.    Um-hum.

23       Q.    -- and August 25, 2017, and there's

24  zero dollars listed for payment there.  Do you see

25  that?



HERMINE BYFIELD                                    September 29, 2021
BYFIELD vs HEALTHCARE REVENUE                                    32

```
 1            A.     Yes.
 2            Q.     Okay.  So it appears, according to the
 3   record produced by Nationwide, that Nationwide never
 4   paid the $900 charge that you incurred for your
 5   treatment at the ER at Nazareth Hospital; correct?
 6            A.     Correct, because it's zero, yes,
 7   um-hum.
 8            Q.     Okay.  Do you know why that bill for
 9   $900 was not paid by Nationwide?
10            A.     That, I don't know.  Because this even
11   the first time I'm seeing this bill too.
12            Q.     Okay.  And did Nationwide ever inform
13   you that it had denied payment for any medical bills
14   that were submitted by your providers for payment?
15            A.     No.
16            Q.     Now, just scrolling back up to the top
17   there, do you see that it has the total amount paid
18   and it's -- for medical, it's $4,999.90?
19            A.     Um-hum.
20            Q.     And then there's amount for "other" of
21   10 cents, bringing it to a total of $5,000.  Do you
22   see that?
23            A.     Yes.
24            Q.     Okay.  And that was the total amount
25   of your coverage for first-party medical benefits
```



1  under your auto policy; correct?

2          A.      Yes.

3          Q.      According to this document, the full

4  $5,000 in medical benefits were paid by Nationwide

5  and were for medical treatment you incurred from the

6  auto accident; right?

7          A.      Yeah, that's what the total said, yes,

8  um-hum.

9                  MR. JONES:  Okay.  I'm going to show

10         you another document here, and we'll mark

11         this as Exhibit 5.

12                 (Exhibit Number 5

13                 marked for identification.)

14  BY MR. JONES:

15         Q.      Can you see the document on the

16  screen, ma'am?

17         A.      Yes.  Um-hum.

18         Q.      Okay.  We subpoenaed, as I mentioned,

19  records from Nationwide, and these were produced.

20  This appears to be a health insurance claim form

21  that was submitted to Nationwide by one of your

22  providers.  And you see the date there?  It's listed

23  as January 19, 2016.

24         A.      Yes.

25         Q.      Okay.  And the date of hospitalization



1    is November 2, 2015?

2            A.      Yes.

3            Q.      All right.  And then scrolling down,

4    the provider -- the billing provider is Emergency

5    Care Services of Pennsylvania, PC and the charge

6    listed there is for $900?

7            A.      Yes.

8            Q.      Okay.  So according to this record, it

9    looks like your provider that provided you treatment

10   at the ER at Nazareth Hospital submitted this $900

11   charge to Nationwide to have it paid by your

12   insurance company; right?

13           A.      I guess, yes.  It's there.

14           Q.      Okay.  Did you ever receive copies of

15   any documents that are referred to either as an

16   explanation of benefits or explanation of review

17   from Nationwide?

18           A.      No.

19                   MR. JONES:  Okay.  We'll mark this as

20           Exhibit 6.

21                   (Exhibit Number 6

22                   marked for identification.)

23   BY MR. JONES:

24           Q.      This was another document produced by

25   Nationwide's counsel in response to our subpoena,



1  and it's an explanation review document submitted --

2  submitted by Nationwide.  It appears to be in

3  response to the claim made by Emergency Care

4  Services of Pennsylvania, PC.  It says the received

5  date is February 3, 2016.  Do you see that?

6           A.    Yes, um-hum.

7           Q.    Okay.  And it lists the $900 charge

8  for your emergency room visit.  Do you see that?

9           A.    Is it down here?

10          Q.    At the bottom here, ma'am.

11                MR. RAYZ:  It's okay.

12                THE WITNESS:  Yes, um-hum.

13 BY MR. JONES:

14          Q.    Okay.  And then there's an explanation

15 given for -- it says "Doc55," which I understand is

16 some kind of code that Nationwide uses.

17                And if we look down here, it states

18 that -- in this paragraph that to make a

19 reimbursement decision, documentation is needed to

20 support the medical necessity for continued care or

21 treatment.  Do you see that?

22          A.    Yes, um-hum.

23          Q.    Okay.  Were you -- were you ever made

24 aware that Nationwide had asked for your medical

25 providers at Nazareth Hospital to submit any



 1  additional documentation before --

 2          A.      No.

 3          Q.      -- they would authorize payment of the

 4  $900 charge you that incurred for your treatment?

 5          A.      No.

 6          Q.      Okay.  I'm going to show you another

 7  document we'll mark as Exhibit 7.

 8                  (Exhibit Number 7

 9                  marked for identification.)

10  BY MR. JONES:

11          Q.      This is another document that was

12  provided by Nationwide's counsel in response to our

13  subpoena and has a received date of February 3,

14  2016, and the service provider again is Dr. Jojo

15  Hammond and the billing provider is Emergency Care

16  Services of Pennsylvania, PC.  Do you see that?

17          A.      Yes.

18          Q.      Okay.  And you agree it appears to be

19  related to the $900 charge incurred for treatment

20  you received on November 2, 2015, at the ER at

21  Nazareth Hospital?

22          A.      Yes, um-hum.

23          Q.      Okay.  And over here, it says the

24  provider reimbursement is zero, and the explanation

25  is BFH, which again looks like it's some kind of



 1  internal code that they use.

 2          Looking down here, the explanation for

 3  BFH is -- it says "The benefits for this

 4  patient/claim are exhausted."  Do you see that?

 5          A.    Yes, um-hum.

 6          Q.    Okay.  So according to these two

 7  documents, Nationwide had declined to reimburse the

 8  provider for this bill of $900 for your treatment at

 9  the ER; correct?

10          A.    Correct, yes, um-hum.

11          Q.    Okay.  And this last document we just

12  reviewed, Nationwide informed the provider that

13  you're -- it had determined that your benefits had

14  been exhausted?

15          A.    Yes.

16              MR. RAYZ:  I'll object.

17              You were talking about first-party

18          medical benefits; right?

19              MR. JONES:  I'm just talking about

20          what the documents says.  It says her

21          benefits were exhausted.

22              MR. RAYZ:  Yeah, but -- hold on.

23          Then -- then -- then I will definitely

24          object.

25              This document is explanation of review



```
 1          for first-party medical benefits, not her --
 2          not her total benefits under the Nationwide
 3          policy.
 4               MR. JONES:  Well, she can explain to
 5          me what she -- what she understands it to
 6          mean.
 7               MR. RAYZ:  She can, but she's never
 8          seen the document before.
 9               THE WITNESS:  I never received that
10          document, though.
11               MR. JONES:  Okay.
12               MR. RAYZ:  She says she's never seen
13          it before and she never received it.
14               MR. JONES:  That's fine.
15     BY MR. JONES:
16          Q.    Did Nationwide ever inform you that it
17     fully paid the coverage limits for your medical
18     benefits under your policy, Ms. Byfield?
19          A.    If they informed me?
20          Q.    Yeah.  Did they ever inform you that
21     Nationwide's position was that they had paid --
22     fully paid the coverage limits for your medical
23     benefits under your policy?
24          A.    They never -- no, I did not hear.
25     They never called me and said they informed me.
```



1  Because I figured, more or less, everything, because

2  of my coverage, it was taken care of, everything.

3  But Nationwide did not call me and have no

4  conversation in regarding my bill.

5         Q.    Did Nationwide ever inform you it was

6  no longer going to pay for your medical bills

7  because your medical benefits coverage was exhausted

8  under your policy?

9         A.    I don't remember that.

10        Q.    Do you know whether or not the medical

11  portion of your auto accident claim was ever closed

12  by Nationwide?

13        A.    Can you repeat that again?

14        Q.    Yeah.

15              After your auto accident, do you

16  recall was -- did the person that you were working

17  with that was handling the medical portion of your

18  claim, did they ever inform you that your -- the

19  medical claim portion of your auto accident claim

20  was going to be closed by Nationwide?

21        A.    Going to be closed?  I don't remember.

22  I don't remember.

23        Q.    Did anyone from Nazareth Hospital's

24  billing department ever inform you that Nationwide

25  had refused to pay this $900 bill from Emergency



1  Care Services of Pennsylvania?

2       A.     No, no.

3       Q.     Did anyone ever inform you that

4  Nationwide had refused to pay that $900 bill?

5       A.     No, except for when I received the

6  letter and I sent that letter over, but I never

7  talked, correspond with no one.

8       Q.     Okay.  And according to the PIP ledger

9  document we reviewed, it looks like the provider,

10  Emergency Care Services of Pennsylvania, attempted

11  to submit the $900 bill for payment by Nationwide on

12  more than one occasion; correct?

13       A.     That, I don't know.

14       Q.     Okay.

15            MR. JONES:  Okay.  I'm going to show

16       you another document.  We'll mark it as

17       Exhibit 8.

18            (Exhibit Number 8

19            marked for identification.)

20  BY MR. JONES:

21       Q.     All right.  Can you see the document

22  on my screen, ma'am?

23       A.     Um-hum.

24       Q.     Now, this is another insurance claim

25  form that was produced by Nationwide, and you see



1  the date is April 19, 2016?

2          A.    Yes.

3          Q.    Okay.  And the hospitalization is for

4  November 2, 2015, and it looks like it's the $900

5  charge for Emergency Care Services of Pennsylvania;

6  correct?

7          A.    Yes, um-hum.

8          Q.    Okay.  And you see it says "medical

9  records attached" there in the middle of the

10 document?

11         A.    Sure, yes, um-hum.

12         Q.    Okay.  And then following this in the

13 documents produced from Nationwide it looks like are

14 copies of medical records relating to your ER visit

15 on November 2, 2015.  Do you see that?

16         A.    Yes, um-hum.

17         Q.    Okay.  So it appears that the provider

18 did attempt to provide the documentation as

19 requested by -- by Nationwide but that your auto

20 insurer still did not pay the bill; right?

21              MR. RAYZ:  Cecil, I'll object.  She

22         testified she's never seen those --

23              THE WITNESS:  I have never seen --

24              MR. RAYZ:  Hold on -- hold on one

25         second.



```
 1                   THE WITNESS:  Okay.
 2                   MR. RAYZ:  You can ask her these
 3           questions, but you're asking her questions
 4           about documents that she's never seen before
 5           today, and --
 6                   MR. JONES:  Okay.
 7                   MR. RAYZ:  -- she's testified that
 8           she's never seen the claim forms.  She's
 9           never seen and reviewed forms.
10                   Her testimony -- if you want to ask
11           her if she knows if it was submitted, that's
12           different, but you're asking her if these
13           documents -- what these documents indicate.
14                   She -- she doesn't know if these
15           documents were ever submitted.  She's not the
16           one who submitted them.  She's never seen
17           them before.  Again, it's -- you can ask her
18           the questions.  She'll answer them, but I'll
19           just follow up and clarify.
20  BY MR. JONES:
21           Q.     Look, I only ask you do you know
22  whether or not Emergency Care Services of
23  Pennsylvania or Nazareth Hospital ever submitted
24  additional documentation as requested by Nationwide
25  in that first explanation of review document that we
```



 1  looked at?
 2              THE WITNESS:  Is that for me?
 3              MR. RAYZ:  Yes, it is.
 4  BY MR. JONES:
 5       A.    No, I don't know.  I don't know.
 6       Q.    Okay.  Do you have any reason to
 7  believe that they did not provide the documentation
 8  requested by your auto insurance carrier?
 9       A.    That, I can't -- I can't answer
10  because I'm not -- I wasn't aware of none of those
11  things.
12       Q.    Okay.  Again, if you don't know, it's
13  perfectly fine to give that response, you know.
14              Let's see.
15              Did you make any claim to your private
16  health insurer for any medical treatment you
17  received following the accident?
18       A.    No.
19       Q.    Okay.  Now, you understood at the time
20  of your treatment in the emergency room at Nazareth
21  Hospital that your provider would charge a fee for
22  their services?
23       A.    They asked me if I have insurance,
24  yes.
25       Q.    Right.



1              Setting aside whether or not you have

2    insurance, you understand that when you go to the

3    ER, that there is a fee associated with the medical

4    treatment that you receive; right?

5         A.    I guess.

6         Q.    Well, if you didn't have insurance,

7    you understand that you would -- you could be

8    responsible for paying for the medical treatment

9    that you had received at the ER; right?

10        A.    Yes, um-hum.

11        Q.    Okay.  And you also understood that if

12   your insurance company did not pay the medical

13   providers' bills for your treatment that you could

14   be personally responsible for making payment;

15   correct?

16        A.    If I don't have insurance, yes.

17        Q.    No, that's a different question.

18             If your insurance company did not pay

19   the bill on your behalf, you would be personally

20   responsible for paying that medical provider's fees

21   for their treatment; correct?

22             MR. RAYZ:  Objection.  That's

23        argumentative.

24             But go ahead.  You can answer.

25



 1  BY MR. JONES:

 2        A.    I would follow back with my insurance

 3  company.  That -- that's what I do for sure.  And

 4  ask them why it doesn't -- why they didn't pay.

 5        Q.    Okay.  And if the insurance company

 6  didn't pay for the medical treatment that you

 7  received at the ER, you would -- you understand that

 8  the medical provider still would be -- would expect

 9  to be paid?

10        A.    Probably, yes.

11              MR. JONES:  Okay.  All right.  I'll

12        mark this as Exhibit 9.  This is -- I'm going

13        to ask you some questions.  This is your --

14        the complaint that was filed in this case.

15              One second.  Hang on.

16              I apologize.  It's just, like, some

17        problem with this PDF program.  It keeps

18        closing down.  I think it's the size of the

19        document sometimes.

20              MR. RAYZ:  That's all right.  If you

21        want to show the complaint, do you want me to

22        just break it out?

23              MR. JONES:  No.  It's -- I'm not going

24        to spend a lot of time on it, Eric.

25              It's just we're connected by VPN, and



```
 1          sometimes the Internet connection is slow.

 2          When you're running Zoom too, it tends to bog

 3          down.

 4                  All right.  Here we go.

 5                  (Exhibit Number 9

 6                  marked for identification.)

 7   BY MR. JONES:

 8          Q.    All right.  Ma'am, can you see the

 9   document displayed on my screen?  This is a copy of

10   the complaint filed on your behalf against

11   Healthcare Revenue Recovery Group by your attorney,

12   Mr. Rayz's office.

13          A.    Yes, I see it, um-hum.

14          Q.    Okay.  And have you seen a copy of the

15   complaint that was filed on your behalf before

16   today?

17          A.    I don't remember seeing it, un-nuh.

18          Q.    Okay.  Now, I understand Mr. Rayz's

19   office also represented you in a lawsuit you filed

20   in Philadelphia County Court of Common Pleas against

21   the other driver as well as Nationwide Insurance; is

22   that right?

23          A.    Yes.

24          Q.    Okay.  When did you first retain his

25   law firm to represent you?
```



1          A.     When did I first?

2          Q.     Yeah.

3          A.     I think this is what?  The second

4     time?  I -- I think it's the second time they

5     represent me because -- it's so long.  You know, I

6     don't remember, like, exact date.

7          Q.     Okay.  So would -- is it fair to say

8     it would have been sometime prior to the filing of

9     the lawsuit in Philadelphia Court of Common Pleas;

10    right?

11         A.     Right, um-hum.

12         Q.     Okay.

13         A.     Yes.

14         Q.     And did Mr. Rayz' office -- did he

15    represent you or did his firm represent you

16    throughout the time period since the lawsuit was

17    filed in Philadelphia Court of Common Pleas?

18         A.     Yes.

19         Q.     Okay.  Now, in your complaint,

20    scrolling down, the allegation here, you allege that

21    my client sent a letter to you on August 3, 2017,

22    that you are claiming violated the Fair Debt

23    Collection Practices Act.  Are you aware of that?

24         A.     The letter from the HH whatever?

25         Q.     HRRG, right.



1        A.     Yes, um-hum.

2        Q.     Okay.  And it says in your complaint

3   that a copy of the letter that you received is

4   attached as Exhibit A.  I just want to show you that

5   document.

6               All right.  This is what's identified

7   as Exhibit A.  Does this appear to be a copy of the

8   letter that you received from HRRG on August 3,

9   2017?

10       A.     Yes, um-hum.

11              MR. JONES:  Okay.  Now I'm going to

12       show you another document we'll mark as

13       Exhibit 10, I believe.

14              (Exhibit Number 10

15              marked for identification.)

16  BY MR. JONES:

17       Q.     Okay.  What we marked as Exhibit 10,

18  can we agree that this appears to be a copy of the

19  same letter that is identified as Exhibit A to your

20  complaint --

21       A.     Yes.

22       Q.     -- the letter from August 3?

23              Okay.  And it also includes the

24  reverse side.  Do you recall does this appear to be

25  what was contained on the back side of that letter?



1          A.     I don't remember.  Well, I guess all

2     bills have that side, yes.

3          Q.     Okay.  Now, this is addressed to you

4     at 6605 Oakland Street, Philadelphia, PA.  Were you

5     residing at that address at the time this letter was

6     sent?

7          A.     How they going to send it to that

8     address and I was living -- I wasn't even living

9     there at the time of the accident?

10          Q.     Well, no, I'm ask -- what I'm asking

11     you:  Were -- were you living at that address at the

12     time --

13          A.     Yeah, I was living --

14          Q.     -- (unintelligible due to

15     overtalking)?

16          A.     -- there before, yeah.

17          Q.     Okay.  And you received this letter in

18     the mail at that address?

19          A.     That, I don't remember.

20          Q.     Okay.  Do you know how else you would

21     have received this letter?

22          A.     The letter, the one with the HHR

23     you --

24          Q.     The one --

25          A.     -- (unintelligible due to



```
 1  overtalking)?

 2          Q.     -- we're looking at right now.

 3          A.     If the one with the HHR, I was living

 4  at Bustleton when I received that one, not at

 5  Oakland.

 6          Q.     Okay.  So it may have been forwarded

 7  to you at the --

 8          A.     Yeah --

 9          Q.     -- Bustleton Avenue --

10          A.     -- not at Oakland.  At Bustleton.

11          Q.     Okay.  Now, the letter, reviewing the

12  first two paragraphs, purports to offer you a

13  settlement to resolve this $900 charge that you

14  incurred through -- for treatment provided by

15  Emergency Care Services of Pennsylvania, PC.  Do you

16  see that?

17          A.     Yes, I saw it right here, um-hum.

18          Q.     Okay.  And from reviewing this letter,

19  you understood this was a letter from HRRG seeking

20  to collect the debt that this provider was seeking

21  to recover from the treatment you received at the ER

22  at Nazareth Hospital?

23          A.     Yes, um-hum.

24          Q.     Okay.  I'm going to go back to your

25  complaint.  In your complaint, it alleges that the
```



1  amount owed, the $900 that was alleged to be the

2  outstanding balance that was claimed by a provider,

3  should have been reduced pursuant to this motor

4  vehicle financial responsibility log.  Do you see

5  that?

6          A.    Can you repeat what you just said?

7          Q.    Yeah.  And you can read it to yourself

8  beginning at 23?

9                Going down, your allegation -- and I'm

10 paraphrasing -- is that the $900 that was listed as

11 the amount owed should have been reduced pursuant to

12 this motor vehicle financial responsibility law.  Do

13 you see that?

14         A.    I saw that, but I never recalled

15 holding, like, any conversation pertaining to that,

16 though, about --

17         Q.    I'm just asking you about the

18 allegations in your complaint for right now.

19                So do you understand that that's what

20 you're claiming in -- in the complaint against HRRG?

21         A.    Oh, for that, yeah, okay.

22         Q.    Okay.  In paragraph 27, it says "In

23 fact, neither the provider nor the defendant even

24 attempted to recalculate the amount owed to

25 determine what the provider may ask for or receive



1    under the MVFRL."

2              Do you understand the provider as

3    being Emergency Care Services of Pennsylvania, PC?

4          A.    Yes, um-hum.

5          Q.    Okay.  Do you have any understanding

6    of what -- what is the Fair Debt Collection

7    Practices Act?

8          A.    No.

9          Q.    Okay.  What about the Motor Vehicle

10   Financial Responsibility Law?  Do you have any

11   familiarity with that statute?

12         A.    No.

13         Q.    Do you have any understanding of what

14   is an Act 6 reduction under the statute?

15         A.    No.

16         Q.    Okay.  Do you have any idea how much

17   you should have owed if an Act 6 reduction were

18   applied to this $900 bill?

19         A.    No.

20         Q.    Okay.  Do you understand whether the

21   Act 6 reduction is something that would be applied

22   by the auto insurance company when the bill is

23   submitted by the provider for payment?

24         A.    No.

25         Q.    Do you know if Nationwide, your auto



1  insurance carrier, determined what Act 6 reductions
2  should be applied when it paid your other medical
3  bills from the auto accident?
4       A.    No.
5       Q.    Okay.  And you were represented by
6  Mr. Rayz' office at the time that you received this
7  letter; correct?
8       A.    Yes.
9       Q.    Okay.  Did -- and you provided a copy
10  of the August 3, 2017, letter to your attorney?
11       A.    Yes.
12       Q.    Did your attorneys ever contact HRRG
13  before filing this lawsuit to advise that you did
14  not believe you that owed this debt?
15       A.    I don't know.
16       Q.    Okay.  Did you contact HRRG after
17  receiving this letter on August 3, 2017?
18       A.    No.
19       Q.    Did you ever inform anyone at
20  Nationwide that you believe that they should --
21  Nationwide should be responsible for paying this
22  debt?
23       A.    No.
24       Q.    And you were never informed that
25  Nationwide had declined to pay it?



1          A.     No.

2          Q.     Prior to receiving this letter, the

3    letter we looked at from August 3, 2017, do you

4    recall receiving any other letters from HRRG?

5          A.     I don't remember.

6               MR. JONES:  We'll mark this

7          Exhibit 11.

8               (Exhibit Number 11

9               marked for identification.)

10   BY MR. JONES:

11         Q.     This is a letter from HRRG dated

12   March 21, 2017, addressed to you, Hermine Byfield,

13   at 6605 Oakland Street in Philadelphia, PA.  Do you

14   see that?

15         A.     Can I just say one thing?

16         Q.     Sure.

17         A.     I don't know.  This address, I've been

18   not living there maybe four years prior to the

19   accident.  So I don't remember seeing no letter from

20   Oakland.

21         Q.     Okay.  Well, that's -- that's exactly

22   what I'm going to ask, so you're kind of

23   anticipating my questions.

24               My question is do you recall ever

25   receiving this letter?



1            A.     No.

2                   MR. JONES:   Okay.  I'll mark this one

3            as Exhibit 12.

4                   (Exhibit Number 12

5                   marked for identification.)

6   BY MR. JONES:

7            Q.     All right.  This is a letter dated

8   August -- or excuse me -- April 26, 2017, from HRRG

9   addressed to you at again at the same address, 6605

10  Oakland Street.  Do you recall ever receiving this

11  letter?

12           A.     I received the one at Bustleton.

13  That's the one I received.

14           Q.     The only letter that you recall

15  receiving at -- when you lived at Bustleton was --

16           A.     Right --

17           Q.     -- the August 3 --

18           A.     Yes.

19           Q.     -- 2017, letter?

20           A.     Because I was living at Oakland prior

21  to the accident.

22           Q.     Okay.  Just a reminder.  Let's just

23  try to make sure we don't talk over each other, but

24  you're doing a good job, though.

25           A.     All right.  I'm sorry.



 1          Q.     It's okay.

 2          A.     Um-hum.

 3                 MR. JONES:  We'll mark this next

 4          document as Exhibit 13.

 5                 (Exhibit Number 13

 6                 marked for identification.)

 7   BY MR. JONES:

 8          Q.     All right.  This is a letter from HRRG

 9   dated June 1, 2017, again addressed to you at 6605

10   Oakland Street.  Do you recall ever receiving this

11   letter?

12          A.     No, un-nuh.

13          Q.     Did you have any communications with

14   any HRRG representatives by telephone?

15          A.     No, I don't.

16          Q.     You don't recall or you didn't have

17   any calls?

18          A.     I don't have any calls.

19                 MR. JONES:  Okay.  I'm just going to

20          play you an audio recording.  This was

21          something that was produced in discovery.

22          Let's see if this refreshes your memory.

23                 Oh, wait a second.  Let me just check

24          before I do that.  Does the Zoom have the

25          ability -- can she -- can she hear what I'm



1  going to play.  Do you know, Eric?

2         MR. RAYZ:  I think so.  I mean, if you

3  want to play it, if we hear it, I'll tell

4  you.  If we don't, I'll tell you too.

5         MR. JONES:  Okay.  Let's see if she

6  can hear it.  You tell me if you have any

7  trouble hearing it.

8         MR. RAYZ:  Okay.

9         MR. JONES:  And I'm going to ask you

10  some questions once we're done listening.

11  Okay?

12         MR. RAYZ:  All right.

13          (Audio recording played.)

14         MR. RAYZ:  Cecil, we can hear it, but

15  it's really, really mute.  It's really low.

16         MR. JONES:  Okay.

17         MR. RAYZ:  We can hear voices, but --

18  but it's hard to make out the words clearly.

19         VIDEOGRAPHER:  This is the

20  videographer speaking.

21         That file, did you -- did you play

22  that from your computer or a separate device?

23         MR. JONES:  I played it on my

24  computer.

25         VIDEOGRAPHER:  All right.  The screen



```
 1              share function --
 2                   MR. JONES:  Yeah.
 3                   VIDEOGRAPHER:  -- you should be able
 4         to screen share that software that you're
 5         using to play it, and then it should at the
 6         bottom have a check box to allow audio.  And
 7         then when you play it, it will play it
 8         through Zoom.
 9                   MR. JONES:  Okay.  All right.  Let's
10         try that again.
11                   (Audio recording played.)
12    BY MR. JONES:
13         Q.    Okay.  Ms. Byfield, does that refresh
14    your recollection that you -- that you called HRRG
15    in response to a letter that you received?
16         A.    Yes, I remember now clearly.  Yes, I
17    do.
18         Q.    Okay.  Was that after you received the
19    August 3, 2017, letter?
20         A.    That, I don't remember if it's after.
21         Q.    Okay.
22         A.    But I know I did call that company --
23    that number, yes.
24         Q.    Do you know when you made this phone
25    call?
```



1          A.       No, I don't remember.  Because I was

2   angry when I saw that they say it was in collection,

3   yes.

4          Q.       Sure.

5          A.       Um-hum.

6          Q.       Why -- and you believed at the time

7   that all of your medical bills had been paid by

8   Nationwide?

9          A.       That's correct, yes.

10         Q.       Okay.  You mentioned that you -- in

11  the call, the recorded phone call that we listened

12  to, that you had several phone calls about your

13  medical bills with Dawn at Nationwide?

14         A.       Exactly.

15         Q.       That was the medical claims adjustor

16  we talked about?

17         A.       Yes.

18         Q.       Okay.

19         A.       And she said everything was paid and

20  why they -- why they send me a letter.  I remember

21  she said that, yes.

22         Q.       Did -- did you ever speak with Dawn or

23  anyone else at Nationwide about the bill of $900

24  from Emergency Care Services of Pennsylvania after

25  you contacted HRRG?



1        A.    I don't remember speaking specific

2   about the $900, but I know I talked to her in

3   regarding something from the bills, the bill.  I

4   don't remember if it's that same bill, but I

5   remember talking to her, and she said it was paid.

6        Q.    Okay.  So Dawn told you that the bill

7   for $900 from Nazareth Hospital, the treatment you

8   received in the ER, had been paid?

9        A.    Like I said, it's -- she didn't

10  precise say the $900 bill.  She said all my medical

11  was -- was covered, was paid, it was covered by

12  Nationwide.

13       Q.    Do you believe if -- to the extent it

14  wasn't paid, did Nationwide make a mistake?

15       A.    That, I could not answer.  I don't

16  know.

17       Q.    Do you believe this bill of $900

18  should have been paid by Nationwide?

19       A.    If I have coverage, yes.

20       Q.    Did you ever ask for documentation

21  from Nationwide to show the bill of $900 from

22  Emergency Care Services of Pennsylvania had been

23  paid?

24       A.    No, I did not.

25       Q.    Did you ask you that Nationwide pay



1  the bill of $900?

2        A.    No, I did not ask, no.

3        Q.    Do you recall having any other phone

4  calls with anyone from HRRG other than the recorded

5  phone call we just listened to?

6        A.    I don't remember.

7        Q.    Okay.  The --

8             MR. RAYZ:  Cecil, can we take a

9        five-minute break?

10            MR. JONES:  Absolutely, yep.

11            MR. RAYZ:  I just want to run to the

12       bathroom.

13            THE WITNESS:  Okay.

14            VIDEOGRAPHER:  Stand by.  We are going

15       off the video record.  The time is 11:39 a.m.

16            (Recess taken.)

17            VIDEOGRAPHER:  We are back on the

18       video record.  The time is 11:44 a.m.

19            MR. JONES:  Sorry about that.  So I --

20       just for the record, I want to make sure I

21       made -- I marked that last exhibit.  The

22       recorded phone call should be Exhibit 14.

23            (Exhibit Number 14

24            marked for identification.)

25            MR. JONES:  I want to show you a copy



1            of the complaint filed in the lawsuit filed

2            on your behalf in Philadelphia County and ask

3            you some questions about that.  We'll mark

4            this as Exhibit 15.

5                   (Exhibit Number 15

6                   marked for identification.)

7     BY MR. JONES:

8            Q.    Can you see that document on your

9     screen, ma'am?

10           A.    Yes.

11           Q.    Okay.  And this appears to be a copy

12    of the complaint filed on your behalf against

13    Desirae Schullere Douglas; PV Holding Corp doing

14    business as Avis Rent a Car; and Nationwide Property

15    and Casualty Insurance Company.  Do you see that?

16           A.    Yes.

17           Q.    Does this refresh your memory that the

18    name of the other driver was believed to be Desirae

19    Schullere Douglas?

20           A.    That's what I'm seeing now.  I don't

21    remember her name.

22           Q.    Okay.  And then scrolling down, in

23    Paragraph 9, it says "At the time and place

24    aforesaid, Defendant PV Holding had rented, leased,

25    or otherwise made its vehicle available to Defendant



1    Douglas."  Do you see that?

2         A.     Yes.

3         Q.     Okay.  Does that refresh your memory

4    that Ms. Douglas was driving a rental car at the

5    time?

6         A.     I don't remember if it was a rental.

7         Q.     Okay.  Now, you've brought -- you've

8    brought claims against your auto insurance company,

9    Nationwide, specifically in Counts 3 and 4.

10               Count 3, you allege that they failed

11   to pay you benefits owed for uninsured motorist

12   coverage.  Do you see that?

13        A.     In what number?

14        Q.     Well, let me ask you a question.  Do

15   you understand that "UM benefits" is shorthand for

16   uninsured motorist benefits?

17        A.     Repeat what you just said.

18        Q.     Yeah.  It says "Count 3.  Plaintiff

19   versus Nationwide UM benefits."

20               "UM benefits," you understand, refers

21   to uninsured motorist coverage benefits?

22        A.     I don't know.

23        Q.     Well, look at Paragraph 32.  It says

24   "At the time Plaintiff purchased the Nationwide

25   policy, she elected to purchase uninsured motorist



1   benefits."  Do you see that?

2        A.      Yeah, I saw that, um-hum.

3        Q.      Okay.  And then scrolling down to

4   Paragraph 37, it says "For the reasons stated above,

5   Defendant Nationwide has violated its obligations

6   under their policy of insurance and breached its

7   contract of insurance by not tendering to Plaintiff

8   the unin -- uninsured motorist benefits which

9   Plaintiff claims are reasonably due to her under the

10  factual circumstances of this case as described

11  herein and incorporated pursuant to Pennsylvania

12  Rule 1019(g)."

13              Does that refresh your memory your --

14  you brought -- a part of your claim against

15  Nationwide was that they had failed to pay you

16  uninsured motorist benefits that you claimed you

17  were due under your auto insurance policy?

18       A.      I don't know.

19       Q.      Okay.  And then Count 4 is for UIM

20  benefits.  Do you understand that to mean

21  underinsured motorist benefits?

22       A.      Um-hum.

23       Q.      Is that "yes"?

24       A.      Yes.

25       Q.      Okay.  And then, again, Paragraph 46



1  similarly states "For the reasons stated above,

2  Defendant Nationwide has violated its obligations

3  under the policy of insurance and breached its

4  contract of insurance by not tendering to Plaintiff

5  the underinsured motorist benefits which Plaintiff

6  claims are reasonably due to her under the factual

7  circumstances of the case as described herein."

8           So does that refresh your memory you

9  also brought a claim against Nationwide alleging

10  that they had failed to pay you underinsured

11  motorist benefits that you claimed you were owed

12  under your policy?

13       A.    If it's there, yes.

14       Q.    The other driver, Mrs. Douglas, she

15  never responded to the complaint that you -- that

16  was filed on your behalf; correct?

17       A.    I don't know.

18       Q.    Okay.  Do you know whether a default

19  judgment was obtained against Ms. Douglas?  Do you

20  know what that is?

21       A.    A false -- what did you say?  A false

22  judgment?

23            MR. RAYZ:  Default.

24            THE WITNESS:  Default.

25



 1  BY MR. JONES:

 2       Q.    Yeah, default judgment.

 3       A.    I don't know.

 4       Q.    Okay.  Did the -- do you know if the

 5  car that she was driving as alleged was a rental

 6  car, if it was rented through Zipcar?

 7       A.    I don't know.

 8       Q.    Okay.  Do you know whether or not the

 9  rental car company maintained auto insurance

10  coverage for the car that the other driver was

11  driving at the time of the accident?

12       A.    I don't know.

13       Q.    Did your attorneys submit a claim for

14  insurance benefits from the rental car company

15  following the accident?

16       A.    I don't know.

17            MR. JONES:  We're on -- we're on

18       Exhibit 16; right?

19            COURT REPORTER:  Yes.

20            (Exhibit Number 16

21            marked for identification.)

22  BY MR. JONES:

23       Q.    I'll show you a document we've marked

24  as Exhibit 16.  This is letter dated January 2,

25  2019, from one of the attorneys at Mr. Rayz'



1    office -- or excuse me -- to one of the attorneys at

2    Mr. Rayz' office from a Beth Kelley at Sedgwick

3    Claims, and it says "Sedgwick Claims Management

4    Services is a third-party administrator for Zipcar,

5    Inc."

6              It says "At the time of the accident,

7    the vehicle owned by Zipcar, Inc. member Rashon

8    Mercer.  Based on the evidence presented in this

9    case, however, the operator was Desirae Schullere

10   Douglas.  At no time material hereto was Ms. Douglas

11   a Zipcar, Inc. member, nor was she ever authorized

12   to operate the subject vehicle.  Hence, no insurance

13   coverage being afforded to Ms. Douglas for any

14   injuries/damages sustained in this accident."

15             Do you see that?

16        A.     Yes, um-hum.

17        Q.     Okay.  Did you ever see this letter

18   before?

19        A.     I don't remember.

20        Q.     Okay.  Do you -- do you -- does it

21   refresh your memory as to whether or not your

22   attorneys sought coverage for injuries that you were

23   claiming from the auto accident from the rental car

24   company that were denied?

25        A.     I don't remember.



1          MR. JONES:  Okay.  We'll mark this one

2     Exhibit 17.

3               (Exhibit Number 17

4               marked for identification.)

5  BY MR. JONES:

6     Q.     This is an answer with new matter to

7  your complaint that was filed on behalf of

8  Nationwide that was produced in discovery by your

9  attorneys.  Have you ever seen this document before?

10     A.     I don't remember.

11     Q.     I'll scroll down to the allegations

12  against Nationwide.  32 through 35 says "Denied.  It

13  is specifically denied that answering defendant has

14  not fully complied with the provisions of the policy

15  to date and strict proof of noncompliance is

16  demanded at trial."  Do you see that?

17     A.     Yes, I seen that, um-hum.

18     Q.     Okay.  So according to this,

19  Nationwide denied that they had failed to pay you

20  uninsured motorist benefits that you claimed you

21  were owed under your auto insurance policy?

22     A.     I don't remember too.

23     Q.     Okay.  And then Count 4 was the count

24  relating to underinsured motorist benefits.  And do

25  you see 41 through 46?  It says "Denied.  It is



1  specifically denied that answering defendant has not

2  fully complied with the provisions of the policy to

3  date and strict proof of noncompliance is demanded

4  at trial."

5            Do you -- are you aware that

6  Nationwide also denied that they had not -- that

7  they had failed to pay you underinsured motorist

8  benefits you claimed you were owed under your auto

9  insurance policy?

10       A.     No.

11       Q.     Am I correct that it was never

12  determined whether the other driver involved in the

13  accident may have had personal auto insurance that

14  could afford coverage for the accident?  Correct?

15       A.     I don't know.

16       Q.     Okay.  You're not aware if the other

17  driver had auto insurance that might afford coverage

18  for the accident?

19       A.     No, I don't know.

20       Q.     Did you or your attorneys submit a

21  claim to Nationwide on your behalf for uninsured or

22  underinsured motorist benefits?

23       A.     I don't know.

24       Q.     Okay.  Do you know whether or not

25  Nationwide denied any claim that was submitted on



1   your behalf for uninsured or underinsured motorist

2   benefits?

3          A.      No.

4          Q.      Scrolling down, Paragraph 48 says that

5   a true and correct copy of the policy, your auto

6   insurance policy, is attached as Exhibit A.

7              I just want to ask you if you

8   recognize that document.  Do you know whether or not

9   Exhibit A is a copy of your auto insurance policy

10  with Nationwide?

11             I can show you the whole thing if you

12  need -- need to see it.

13         A.      I don't recall this, seeing this.

14         Q.      Okay.  The policy number listed there

15  in Paragraph 48, that's the policy number that we --

16  that we looked at before that was for the policy in

17  effect at the time of the auto accident, though;

18  right?

19         A.      I don't even remember my policy

20  number.

21         Q.      Okay.  Are you aware, did Nationwide

22  argue that under the terms of your policy, you were

23  not entitled to any additional insurance coverage

24  benefits beyond payment of the $5,000 in first-party

25  medical -- medical benefits they had paid on your



1   behalf?

2        A.     I don't know.  No, I don't know.

3        Q.     Okay.  Now, I understand that the case

4   proceeded to a compulsory arbitration hearing.  Are

5   you aware of that?

6        A.     Say that again?

7        Q.     There was an arbitration hearing, were

8   you aware of that --

9        A.     Yes --

10       Q.     -- in the case?

11       A.     -- I remember that, um-hum.

12       Q.     Okay.  And that was held on June 1,

13  2018?

14       A.     I don't remember the exact date

15  precise, but I remember the arbitration, day.

16              MR. JONES:  Okay.  We'll mark this as

17         Exhibit 18.

18              (Exhibit Number 18

19              marked for identification.)

20  BY MR. JONES:

21       Q.     This is a report and award of

22  arbitrators that was filed in the lawsuit that you

23  filed in Philadelphia County, and you see it says

24  there's an award reported June 8, 2018?

25       A.     Yes, I'm seeing that now, if that's



1  the date.

2       Q.    Okay.  Does that refresh your memory?

3  Is that the date of the arbitration hearing?

4       A.    Like I said, I don't remember the

5  precise date, but I remember about the arbitration,

6  arbitrator, um-hum.

7       Q.    Okay.  And it says (as read) "We

8  assess damages in favor of Plaintiff, Hermine

9  Byfield, and against the Defaulted Defendant Desirae

10 Schullere Douglas (said default entered on

11 12/14/17) in the amount of $15,000 for injuries

12 sustained in the motor vehicle accident of

13 November 2, 2015."

14            Did I read that correctly?

15      A.    Yeah, um-hum.

16      Q.    Okay.  Does this refresh your memory

17 that Ms. Douglas -- that the court entered a default

18 judgment against her for failing to respond?

19      A.    That's what I'm seeing right now,

20 um-hum.

21      Q.    Okay.  And then it says "We find in

22 favor of Defendant PV Holding Corp AKA Avis Rent A

23 Car DBA and Nationwide Property and Casualty

24 Insurance Company and against Plaintiff Hermine

25 Byfield on all counts."



1              Did I read that right?

2        A.    I can't see that.

3              MR. RAYZ:  Just give us one second.

4        We need to move the screen.

5              MR. JONES:  Sure, sure.

6              THE WITNESS:  So could you repeat what

7        you were saying now?  Because I couldn't see

8        at the time.

9   BY MR. JONES:

10       Q.    That's okay.  I'm just -- it's in

11  handwriting.  I want to make sure we're on the same

12  page and I'm reading it correctly.

13             It says "We find in favor of

14  Defendants PV Holding Corp AKA Avis Rent A Car DBA

15  and Nationwide Property and Casualty Insurance

16  Company and against Plaintiff, Hermine Byfield, on

17  all counts."

18             Did I read that right?

19       A.    Yeah, that's -- that's what I saw

20  here, um-hum.

21       Q.    Okay.  Does this refresh your memory

22  the arbitration panel found in favor of the other

23  defendants but -- but ruled in your favor as against

24  the other driver?

25       A.    I guess, yes.  That -- that -- it's



1  in -- written right here.

2       Q.    Okay.  So the arbitration panel

3  declined to find that Nationwide had improperly

4  failed to pay you uninsured motorist benefits or

5  underinsured motorist benefits under your auto

6  policy; correct?

7       A.    Yeah, that's what it's saying, stating

8  --

9       Q.    Okay.

10       A.    -- (unintelligible due to

11  overtalking).

12       Q.    Are you aware, did you appeal the

13  arbitration panel's decision?

14       A.    I don't remember.

15       Q.    Okay.  The case never proceeded to

16  trial after the arbitration panel's decision;

17  correct?

18       A.    I don't remember.

19       Q.    Okay.  Are you aware, did you reach a

20  settlement with Nationwide after the arbitration?

21  Correct?

22       A.    I -- I don't remember if we did reach

23  a settlement, but I know I got something, but I

24  don't remember.

25       Q.    Are you aware -- was there a written



1  settlement agreement or release that you signed in

2  favor of Nationwide after the arbitration hearing?

3        A.    I don't remember.  It's, like, five

4  years now.  I don't remember.

5        Q.    Did you receive a monetary payment

6  from Nationwide to settle your claims against

7  Nationwide in the lawsuit filed in Philadelphia

8  County?

9        A.    I think I -- I received something,

10 but  it wasn't the outstanding something.  I

11 received something, yeah.

12       Q.    You received --

13       A.    I don't know what -- yeah, um-hum.

14       Q.    You received money?

15       A.    Yes.

16       Q.    Okay.  And did you sign a release in

17 exchange for receiving the money paid by Nationwide?

18       A.    I probably do.  I don't remember

19 quite.

20            MR. JONES:  Okay.  Counsel, I think

21       this was produced.  I couldn't find it in my

22       files, but I just ask for a copy of any

23       settlement agreements that were reached to

24       resolve the claims in the underlying case as

25       related to Nationwide.



```
 1                    MR. RAYZ:  Oh, it was -- it was
 2          produced.  Hold on.  I'm pretty sure I
 3          produced it.
 4                    MR. JONES:  Okay.  That's fine.  We
 5          can talk about it offline.
 6                    MR. RAYZ:  Yeah.  No, we have it.
 7  BY MR. JONES:
 8          Q.    Ms. Byfield, do you agree there was
 9  never a determination by any court of law that you
10  were entitled to additional insurance coverage
11  benefits under your auto insurance policy with
12  Nationwide for the accident that occurred on
13  November 2, 2015?  Correct?
14                    MR. RAYZ:  I'll object as
15          argumentative.
16                    But go ahead and you can answer.
17  BY MR. JONES:
18          A.    I don't know.
19          Q.    You're not -- you're not aware of any
20  judge or fact-finder that said you that should have
21  been paid more insurance benefits by Nationwide
22  under your auto insurance policy?
23          A.    No, I don't.
24                    MR. RAYZ:  I'll -- I'll object as
25          argumentative.
```



1              But go ahead.  You can answer.

2  BY MR. JONES:

3       A.    No, I don't.

4       Q.    Okay.  Just moving on to damages.

5  We're getting pretty close to the end.

6              Do you need to take a break?

7       A.    No.

8       Q.    Okay.

9       A.    I'm fine.  Thanks.

10      Q.    Are you aware, did you incur any

11 economic damages such as out-of-pocket expenses or

12 other types of monetary damages that you claim to

13 have incurred as a result of any actions by HRRG

14 that you are alleging violated the Fair Debt

15 Collections Practices Act?

16      A.    No.

17      Q.    Are you claiming you suffered any kind

18 of noneconomic damages such as psychological or

19 emotional harm as a result of any actions by HRRG

20 that you allege violated the Fair Debt Collection

21 Practices Act?

22      A.    The only thing I suffered -- it's

23 about for me when they send me to collection agency,

24 I was, like, that's, you know... no.  Yeah.

25      Q.    Well, can you explain to me what -- so



1  what damages are you claiming that you suffered?

2        A.    Because that was -- it's on my credit,

3  was ruining my -- it's on my credit, I think,

4  because I was sent to collection.

5        Q.    Okay.  So you -- did you check your

6  credit report at some time and you found an entry

7  for the $900 charge for Emergency Care Services of

8  Pennsylvania?

9        A.    It was said that I was sent over to

10 credit bureau.  So I didn't, like, check my credit,

11 but it -- remember, one, in the -- on the

12 conversation, I was telling them that I was sent

13 over to credit bureau.

14       Q.    Okay.

15       A.    Um-hum.

16       Q.    So my question is do you know if there

17 actually was anything reported on your credit

18 report?

19       A.    Because I didn't -- I didn't pull my

20 credit file.  I didn't.  I didn't look to see.

21       Q.    Okay.  So you're not aware of whether

22 or not there actually was an entry on your credit

23 report for --

24       A.    To be honest, no.

25       Q.    -- the $900 charge?



 1          A.     To be honest, no, I don't know.

 2          Q.     Now, and my original question, just

 3   are you claiming that you suffered any kind of

 4   emotional harm as a result of any actions by HRRG,

 5   specifically the letter that you received on

 6   August 3, 2017?

 7          A.     No.

 8          Q.     Okay.  And I assume then you haven't

 9   treated with any kind of mental health professionals

10   or medical providers for any kind of injuries you're

11   claiming in this case?

12          A.     No.

13          Q.     Okay.  Okay.  Is there anyone that

14   you're aware of that we haven't discussed that you

15   believe may have relevant knowledge about your

16   claims in this lawsuit, whether it's a

17   representative of HRRG or Nationwide or someone

18   else?

19          A.     Not that I know of, no.

20          Q.     Okay.  Have you spoken with anyone

21   else other than your attorney about your lawsuit or

22   the allegations in the case?

23          A.     No.

24                 MR. JONES:  Okay.  Those are all the

25          questions I have, ma'am.



```
 1              THE WITNESS:  Thank you.
 2              MR. JONES:  Thank you very much.
 3              THE WITNESS:  You're welcome, um-hum.
 4              MR. JONES:  Miss Court Reporter --
 5      we'll go off the video first.
 6              MR. RAYZ:  Cecil, I -- I have some.
 7              MR. JONES:  Oh, I -- I'm sorry, Eric.
 8      Go ahead.
 9              MR. RAYZ:  All right.  Let me know if
10      we're back on the record or if we ever came
11      off.
12              COURT REPORTER:  We're still on.
13              MR. JONES:  No, no.  We're good.  I --
14      you know, I never asked the question.  I'm
15      sorry.  Go ahead.  You're right.
16              MR. RAYZ:  Cecil, can you pull up the
17      policy?  I believe that it's Exhibit 2.
18              MR. JONES:  That's the dec page or the
19      policy?  Dec page.
20              MR. RAYZ:  The dec page.  I think
21      there's more than one page there, though.
22              MR. JONES:  Yep.
23              MR. RAYZ:  Okay.
24              Okay.  And can you scroll down a
25      little bit.
```



1              MR. JONES:  Um-hum.  Just tell me when

2       to stop.

3              MR. RAYZ:  A little more.

4              A little more.

5              There we go.

6              And just -- just -- all right.  That's

7       fine.

8              Ms. Byfield, you're looking -- you're

9       looking at Exhibit -- is it -- I'm sorry,

10      Felix [sic].

11             MR. JONES:  This is 2.

12             MR. RAYZ:  Pardon me.  Cecil.  Is this

13      Exhibit 1 or 2?  1; right?

14             MR. JONES:  No, it's 2.  1 was the

15      medical record.

16                     EXAMINATION

17 BY MR. RAYZ:

18      Q.   Okay.  Ms. Byfield, I'm going to show

19 you what's -- what's already been marked as Exhibit

20 2, and I'm going to point you to the top right

21 corner of this page.  I believe that this is page 3,

22 if I'm not mistaken.  Page 4 of this exhibit.

23             And I'm going to show you -- I'm going

24 to point specifically for you the notation that

25 indicates policy period.  Do you see that?



```
 1            A.      Um-hum.

 2            Q.      Okay.  And the dates on the policy

 3   period are August 29, 2015, through February 29,

 4   2016 --

 5            A.      Okay.

 6            Q.      -- is that correct?

 7            A.      Um-hum.

 8            Q.      All right.  And the policy number

 9   underneath indicates -- the indication is that it's

10   5837E925160.  Can you see that?

11            A.      Um-hum.

12            Q.      Okay.  So I have a couple of questions

13   about that.  Number one, is this the -- to the best

14   of your knowledge, is the Nationwide policy that you

15   had at the time of the accident on November 2, 2016?

16            A.      Honestly, I don't remember offhand,

17   but I know I have insurance coverage, but I don't

18   remember, like, the policy number and all of that.

19            Q.      Okay.  Let me correct my question.

20            A.      Um-hum.

21            Q.      I asked you about November 2, 2016.

22   The accident was November 2, 2015.

23            A.      Right.

24            Q.      Okay.

25            A.      Um-hum.
```



```
 1          Q.    So let me -- let me just make sure
 2    that the record is clear.
 3          A.    Um-hum.
 4          Q.    Do you have any reason to -- is this
 5    the policy that you had in effect with Nationwide at
 6    the time of the accident on November 2, 2015?
 7          A.    If they have it on paper, yes.
 8          Q.    Okay.
 9          A.    Yes.  I always have insurance.
10          Q.    Okay.
11          A.    Um-hum.
12                MR. RAYZ:  And, Cecil, can you just
13          move up just a little bit?
14                And I'm sorry.  Not up.
15                Can you move down a little bit to
16          the -- there we go.  Okay.
17    BY MR. RAYZ:
18          Q.    And the vehicle -- I know that you
19    were asked this before, but the vehicle that was
20    involved in the accident that you were driving --
21          A.    Um-hum.
22          Q.    -- was a 2014 Nissan Rogue; is that
23    correct?
24          A.    That's correct, yes, um-hum.
25          Q.    And looking at the very same page, at
```



1  the bottom of Page 4 here on the -- on Exhibit 2,

2  I'm looking at the various limits of liability.  Do

3  you see that?

4          A.      Um-hum.

5          Q.      And there is a listing.  One of them

6  is for property damage.  One of them is for bodily

7  injury liability.  Do you see that?

8          A.      Um-hum.

9          Q.      Okay.  And do you recall specifically

10 paying for uninsured or underinsured motorist

11 benefits on your policy?

12         A.      I don't remember, but I know my

13 coverage was fully cover -- covered, that I have a

14 fully coverage on my insurance --

15         Q.      Okay.

16         A.      -- and my -- yeah, but I don't

17 remember, like, specific everything.

18         Q.      All right.  Let me ask you this:  Do

19 you still have Nationwide Insurance for your motor

20 vehicle?

21         A.      Until today, yes.

22         Q.      Okay.

23         A.      Um-hum.

24         Q.      And from November of 2015 through

25 today's date, have you ever had any other motor



1  vehicle insurance?

2       A.    No.  Only my daughter.  I think she

3  had a fender-bender.

4       Q.    No, no, not accidents.  I'm talking

5  about insurance -- insurance.  Did you ever have any

6  other insure -- motor vehicle insurance?

7       A.    No, un-nuh.

8       Q.    It was always with Nationwide?

9       A.    It's always with Nationwide.

10      Q.    Okay.  So let me ask you this:  Did

11  you -- do you recall ever changing your policy

12  limits since November 2, 2015?

13      A.    Yeah, I remember because I think I

14  have, like -- it's increased more, like, hundred

15  thousand and stuff, 300 -- the policy, if I'm not

16  mistaken.  But I have more coverage now.

17      Q.    Okay.  So you added more coverage --

18      A.    Right --

19      Q.    -- since the accident?

20      A.    -- right.  Not since.  Yeah, after the

21  accident.

22      Q.    After the accident?

23      A.    Yeah, um-hum.

24      Q.    Okay.  Do you know if you -- if

25  this -- if you had a Nationwide insurance policy at



1  the time the letter from Healthcare Revenue Recovery

2  Group was sent August 3, 2017?

3       A.    At one point, I think I had -- they

4  did drop me at one point, and then I get back to

5  that.  I don't remember in what year, but it's after

6  the accident, I didn't have Nationwide for maybe a

7  couple of months.

8       Q.    Okay.

9       A.    Um-hum.

10      Q.    Let me ask you this:  Do you -- at the

11 time of your -- I know it's been some time.  It's

12 actually been almost five years --

13      A.    Right.

14      Q.    -- but --

15      A.    Um-hum.

16      Q.    -- do you recall anyone informing you

17 at Nazareth that either Dr. Hammond or Emergency

18 Care entity would charge $900 for its services that

19 were being provided to you when you were at Nazareth

20 on that day?

21      A.    No, no, no.

22      Q.    Did you ever agree to pay anyone $900

23 for any services that were provided to you at

24 Nazareth by anyone on November 2nd --

25      A.    No.



```
 1        Q.     -- 2015?

 2        A.     No.

 3        Q.     Okay.  You were asked questions by

 4   counsel for Healthcare Revenue Recovery Group

 5   regarding the damages that you may have suffered.

 6               Let me ask you a question.  The phone

 7   call that we heard --

 8        A.     Um-hum.

 9        Q.     -- that was played --

10        A.     Um-hum.

11        Q.     -- you sounded pretty upset on that

12   phone call --

13        A.     I was.

14        Q.     -- is that accurate?

15        A.     I was.

16               MR. JONES:  Objection to form.

17   BY MR. RAYZ:

18        Q.     Can you -- can you explain -- can you

19   explain what is it that made you -- that made you

20   angry?

21        A.     Because after I know the coverage what

22   I have with Nationwide and all of that, and when

23   the -- Dawn, when she told me that everything was

24   taken care of, I was shocked after when I received

25   that letter, you know, so I was pretty angry.  And
```

 1  then it was telling me it went to collections and

 2  stuff like that.  So, yes, I was.

 3          Q.    Do you think that the resolution of

 4  your personal injury case was delayed because of

 5  that letter?

 6          A.    Yes.

 7                MR. JONES:  Objection to form.

 8          Leading.

 9                THE WITNESS:  Yes.

10                MR. RAYZ:  That's all the questions I

11          have.

12                    FURTHER EXAMINATION

13  BY MR. JONES:

14          Q.    Ms. Byfield, why -- why do you claim

15  that your resolution of your personal injury case

16  was delayed?

17          A.    It was -- I think it was delayed

18  because of the whole back-and-forth with this bill

19  from the hospital and all of that, you know.

20          Q.    Why do you believe that?

21          A.    Because of the time frame and

22  everything.

23          Q.    Okay.  And are you claiming that you

24  incurred any kind of damages because of delay in

25  resolution of your personal injury case?



 1          A.      It -- maybe emotion, emotional.

 2          Q.      What do you mean by that?

 3          A.      Like, yeah, that too.  Emotional

 4    because of, like, this back-and-forth with the

 5    billing, and I don't recall speaking to anyone in

 6    regarding to pay $900.  Because I was covered with

 7    insurance, and on top of that, I had health

 8    insurance separate from that, you know.

 9          Q.      Okay.  And can you describe for me,

10    when you say that you had emotional issues, what do

11    you mean?

12          A.      It was upsetting.  It was upsetting

13    for me and stuff like that.

14          Q.      Did you have any -- experience any

15    kind of physical injuries or symptoms?

16          A.      Well, when I get angry, my blood

17    pressure is going to raise because I have high blood

18    pressure, yes.

19          Q.      Did any -- did you seek out any

20    treatment for any exacerbation of your blood

21    pressure problems that you attribute to, you know,

22    stress --

23          A.      Well, I know that --

24          Q.      -- (unintelligible due to overtalking)

25    with HRRG?



1        A.    When if -- if I'm there and I know

2   when it's -- my blood pressure high, all I have to

3   do is go take a pill.  I have medication for that.

4        Q.    What medication do you take?

5        A.    Amlodipine.

6        Q.    And did you -- but my question was did

7   you have to seek out any treatment from a medical

8   provider --

9        A.    No.

10       Q.    -- for any kind of problems that you

11  had for high blood pressure?

12       A.    No, no.

13            MR. JONES:  Okay.  Thanks.  That's all

14       the questions I have.

15            THE WITNESS:  Thank you.

16            MR. JONES:  I apologize, Eric.  Do you

17       have other questions?

18            MR. RAYZ:  No, no, I don't.  I'm good.

19            THE WITNESS:  Thank you too.

20            MR. JONES:  Okay.

21            VIDEOGRAPHER:  This is the

22       videographer.  Would Mr. Rayz wish to order a

23       copy of the video?

24            MR. RAYZ:  I don't need a copy of the

25       video.  I just need the written transcript.



1          VIDEOGRAPHER:  Okay.  And, Mr. Jones,

2    would you like yours synced or unsynced?

3          MR. JONES:  Unsynced is fine.

4          VIDEOGRAPHER:  And standard delivery

5    time?

6          MR. JONES:  Yes.

7          VIDEOGRAPHER:  Okay.

8          MR. JONES:  And can I -- Miss Court

9    Reporter, can I get your e-mail address so I

10   can -- am I going to send you the exhibits

11   directly?

12         COURT REPORTER:  Yes.

13         VIDEOGRAPHER:  Stand by.

14         Madame Court Reporter, do you have

15   anything to add?

16         COURT REPORTER:  Yes.  Just so it's

17   clear, may I just have counsel indicate on

18   the record whether they wish to order a copy

19   of the transcript?

20         MR. JONES:  Yes.

21         MR. RAYZ:  Yes.  And we will reserve

22   the read and sign.

23         COURT REPORTER:  Okay.  Thank you.

24         MR. RAYZ:  It's very (unintelligible.)

25         VIDEOGRAPHER:  Stand by.



```
1            We'll go off the record in the video
2   deposition of Hermine Byfield.  We'll go off
3   the record on Wednesday, September 29, 2021,
4   at 12:16 p.m.
5                    — — —
6            (Remote videotaped videoconference
7            deposition concludes, 12:16 p.m.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```



```
 1              C E R T I F I C A T E

 2
                I, Lisa Taylor, Registered Professional
 3    Reporter and notary public certify:

 4              That the foregoing deposition of
      Hermine Byfield was taken before me at the time and
 5    place therein set forth at which time the witness
      personally appeared before me via videoconferencing
 6    and was duly remotely sworn or affirmed;

 7              That the testimony of the witness and all
      objections made at the time of the deposition were
 8    recorded stenographically by me and thereafter
      transcribed;
 9
                That the foregoing deposition is a true
10    record of the testimony and of all objections made
      at the time of the deposition.
11
                I further certify that I am neither
12    counsel for nor related to any party to said action,
      nor in any way interested in the outcome thereof.
13
                My certification as to the accuracy of
14    this transcript, if it has been reformatted or
      altered from its original form in any manner, is
15    null and void.

16              In witness whereof, I have subscribed my
      name this 12th day of October 2021.
17

18

19    _____

20
      Lisa Taylor
21    Registered Professional Reporter
      Notary Public
22

23

24

25
```



```
 1   Reference No.: 7415592

 2

 3   Case:  BYFIELD vs HEALTHCARE REVENUE

 4

         DECLARATION UNDER PENALTY OF PERJURY
 5
          I declare under penalty of perjury that
 6   I have read the entire transcript of my Depo-
     sition taken in the captioned matter or the
 7   same has been read to me, and the same is
     true and accurate, save and except for
 8   changes and/or corrections, if any, as indi-
     cated by me on the DEPOSITION ERRATA SHEET
 9   hereof, with the understanding that I offer
     these changes as if still under oath.
10

11       _____

12            Hermine Byfield

13

14            NOTARIZATION OF CHANGES

15               (If Required)

16

17   Subscribed and sworn to on the _____ day of

18

19   _____, 20_____ before me,

20

21   (Notary Sign)_____

22

23   (Print Name)                    Notary Public,

24

25   in and for the State of _____
```



```
1    Reference No.: 7415592
     Case:  BYFIELD vs HEALTHCARE REVENUE
2

3    Page No._____Line No._____Change to:_____

4    _____

5    Reason for change:_____

6    Page No._____Line No._____Change to:_____

7    _____

8    Reason for change:_____

9    Page No._____Line No._____Change to:_____

10   _____

11   Reason for change:_____

12   Page No._____Line No._____Change to:_____

13   _____

14   Reason for change:_____

15   Page No._____Line No._____Change to:_____

16   _____

17   Reason for change:_____

18   Page No._____Line No._____Change to:_____

19   _____

20   Reason for change:_____

21   Page No._____Line No._____Change to:_____

22   _____

23   Reason for change:_____

24
     SIGNATURE:_____DATE:_____
25   Hermine Byfield
```



```
 1    Reference No.: 7415592
      Case:  BYFIELD vs HEALTHCARE REVENUE
 2

 3    Page No._____Line No._____Change to:_____

 4    _____

 5    Reason for change:_____

 6    Page No._____Line No._____Change to:_____

 7    _____

 8    Reason for change:_____

 9    Page No._____Line No._____Change to:_____

10    _____

11    Reason for change:_____

12    Page No._____Line No._____Change to:_____

13    _____

14    Reason for change:_____

15    Page No._____Line No._____Change to:_____

16    _____

17    Reason for change:_____

18    Page No._____Line No._____Change to:_____

19    _____

20    Reason for change:_____

21    Page No._____Line No._____Change to:_____

22    _____

23    Reason for change:_____

24
      SIGNATURE:_____DATE:_____
25    Hermine Byfield
```

