IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| HERMINE BYFIELD, | CIVIL ACTION |
| *Plaintiff,* | NO. 18-243 |
| v. | |
| HEALTHCARE REVENUE RECOVERY GROUP, LLC, | |
| *Defendant.* | |

**PAPPERT, J.**                                                                                          October 31, 2023

### MEMORANDUM

Practicing law is difficult and not for everyone. Lawyers do not always do the right things. Perhaps it is because they do not do the research or the work required to do the job properly, or they do not follow rules governing their conduct and business in the courts. Judges, reformed lawyers themselves, understand this and generally give otherwise well-intentioned lawyers a fairly wide berth. In most cases, those lawyers who slip up need only acknowledge their mistake, perhaps apologize for it depending on its severity, and move on.

But sometimes lawyers just cannot help themselves. They continue digging deeper into the hole, doubling down on their errant ways. And sometimes judges who otherwise would have let things go cannot save those lawyers from themselves. This is where the Court finds itself with Daniel Sansoni. Sansoni, having long ago moved from Philadelphia to Florida, no longer handles many cases in our Court. His practice, which he described as "very limited," consists mostly of immigration work.

1

At the behest of a former client, Sansoni injected himself into a previously settled case and filed an ill-conceived and poorly (if at all) researched motion for a seemingly improper purpose. After being told by the Court that he and his client needed to attend, in person, the Court's hearing on the motion, he failed to show up. Without telling the Court, he farmed the case out to another lawyer and stayed home in the sunshine state. Stand in counsel did his best, but at the hearing Sansoni's motion imploded for a number of reasons, including the plaintiff's unwillingness to testify and the new lawyer's concession that the motion's requested relief was not available under the theory upon which Sansoni relied.

Ordered to show cause why he should not be sanctioned under Rule 11, Sansoni compounded his transgressions by lying, both in his written response to the Court's order and at the show cause hearing. And that is when it became obvious the Court had to do something to deter Sansoni from practicing law that way. This opinion and a $1,000.00 fine will hopefully do the trick.

I

This case has a very long history preceding Sansoni's involvement. In November of 2015, Hermine Byfield was injured in a car accident and treated for those injuries at Nazareth Hospital. In August of 2017, Healthcare Revenue Recovery Group (HRRG), a debt collector, sent Byfield a letter demanding a $900.00 payment for Nazareth's emergency care. Attorney Eric Rayz, who represented Byfield pursuant to a written contingent fee agreement with respect to the underlying accident, filed this lawsuit against HRRG in January of 2018 alleging violations of the Fair Debt Collection

Practices Act. (ECF 1). There was apparently no separate written fee agreement between Rayz and Byfield for this litigation.

For the next five and a half years, the case was aggressively litigated on both sides with numerous motions, extensive briefing, court conferences and failed settlement efforts. This spring, the Court denied a motion for summary judgment filed by HRRG in *Zhyriada v. Healthcare Revenue Recovery Group*, a case Mr. Rayz brought on behalf of a different client with claims similar to Byfield's. With a summary judgment motion filed by HRRG also pending here, Rayz asked the Court to refer this case to Magistrate Judge Hey, who was overseeing settlement efforts in *Zhyriada*. (ECF 78). The Court did so and Judge Hey issued notices of her policies and procedures and scheduled a settlement conference for June 15, 2023. (ECF 79, 81, 82, and 83). One of Judge Hey's standard requirements is that the parties and representatives participating in her settlement conferences have authority to settle the case. (ECF 82, 83 and 92).

The June 15 settlement conference, however, never took place. On June 12, the parties informed Judge Hey they had reached an agreement and that the case could be dismissed. Judge Hey reported the settlement to the Court, which issued an order dismissing the case with prejudice. (ECF 84). That was the end of several years of litigation—until Sansoni entered his appearance as Byfield's attorney and filed his "Motion to Vacate the Dismissal of This Action and Reopen the Proceedings." (ECF 86, 87).

The motion was unique to say the least. Sansoni claimed his new client never gave Rayz authority to settle the case and that by agreeing to the settlement Rayz

3

violated Judge Hey's notice requiring participants at her settlement conferences to have settlement authority. (Mot. To Vacate, at ¶¶ 6, 7, ECF 87). But Sansoni did not ask the Court to void the settlement. To the contrary, he argued that the "settlement amount" constituted a "binding contract between the plaintiff and the defendant." (*Id.* at ¶ 2). The motion, Sansoni claimed, was "about the plaintiff's former attorney [Rayz]" and the relief sought, at least in the motion, was that the Court vacate the case's dismissal solely to allow Sansoni to file a motion for sanctions against Rayz under Federal Rule of Civil Procedure 11(c). (*Id.* at ¶ 4). For good measure, Sansoni alleged that Rayz had been "recommended" for attorney discipline in Pennsylvania and was sanctioned in another case in what the Court would later learn was heard in federal court in Florida. (*Id.* at ¶¶ 9, 10).

But if all Sansoni and Byfield wanted was for the Court to vacate the case's dismissal (without disturbing the settlement) just so Sansoni could file a Rule 11 motion against Rayz, one paragraph of the motion to vacate seemed out of place. Paragraph 8 expressed disagreement with the allocation of the settlement funds (i.e, what Byfield received versus Rayz's attorney fees) and complained about Rayz not providing Sansoni with a separate fee agreement for the FDCPA suit. (*Id.* at ¶ 8). And the only exhibit to the motion was an unsworn "statement" by Byfield, addressed "To Whom It May Concern." (*Id.* Ex. A). The statement, which Sansoni acknowledged helping write, was prepared, not for use with the motion to vacate, but as a complaint against Rayz to the disciplinary board. (Show Cause Hr'g Tr. 55:20-25, 56:1-19, ECF 105). In any event, it shed more light on Paragraph 8's dissatisfaction with the "allocation of the settlement funds." Here the Court learned that Byfield's primary

gripe was that the case settled for $136,000.00 but that her share was $1,500.00 ($500.00 more than her $1,000.00 statutory damages award) with the rest going to Rayz. The statement's final paragraph sets out what Byfield (and Sansoni) really wanted—70% of the $136,000, ostensibly consistent with the terms of the contingent fee agreement in the underlying accident litigation.

The Court held a telephone conference with Sansoni, Rayz and HRRG's counsel on September 22, (ECF 90, 91), during which the Court stated that it wanted to schedule an evidentiary hearing and oral argument on the motion for as soon as everyone's schedules allowed. Sansoni, from Florida, asked if the hearing could be conducted on Zoom or by telephone. The Court rejected that request, citing the seriousness of the motion's allegations and the need for Sansoni and Byfield to attend in person so the Court could assess and weigh her testimony against that of Rayz and any other witness who had knowledge of the settlement and attendant circumstances.

Once he realized he needed to be there in person, Sansoni told the Court that Mondays or Tuesdays worked best for him. The Court decided on Tuesday, October 3 and issued the appropriate scheduling order. (ECF 92). But Sansoni sent Byfield to the hearing with a different lawyer, Gary Seitz, who told the Court he was not "entirely certain" why Sansoni did not come, that he did not know Sansoni much less work with him, did not know how Sansoni came to call him for this assignment and had never previously met or represented Byfield. (Oral Arg. Tr. 5:10-24, 6:12-20, ECF 100). For her part, Byfield said Sansoni never told her that he did not know Seitz (a bankruptcy and maritime lawyer) or why he was staying in Florida rather than representing her at the hearing. (*Id.* at 12:14-24, 14:4-7).

The hearing went downhill from there, with Seitz stating that Rule 11, Sansoni's vehicle for filing the motion to vacate, was not an appropriate remedy, (*id.* at 20:5-17), admitting that it was "unprecedented" to vacate a case's dismissal (predicated on the settlement) while keeping the settlement in place so Byfield could keep what she had already been paid, (*id.* at 53:10-23), and then conceding that Byfield did not really want Rayz sanctioned; she preferred to receive a larger chunk of the settlement proceeds. (*Id.* at 54:22-25). Hearing and seeing enough, Byfield fired Sansoni, with whom she had become "very unhappy," declined to testify, withdrew the motion to vacate, and agreed not to pursue Rayz for a larger chunk of the settlement (or anything else) in this or any other judicial forum. (*Id.* at 62:23, 63:3, 64:2, 65:6, 74:14-15).

II

On October 5, the Court issued its Order requiring Sansoni to show cause why he should not be sanctioned under Federal Rule of Civil Procedure 11, 28 U.S.C. § 1927, and the Court's inherent authority. (ECF 102). Specifically, the Court ordered him to explain why his motion: (1) was not filed for an improper purpose under Rule 11(b)(1) given that his requested relief—the ability to file Rule 11 sanctions against Rayz—was not applicable to anything Rayz was alleged to have done; (2) was not filed for an improper purpose under 11(b)(2) given the motion appeared to have been filed primarily to obtain leverage in a fee dispute; (3) was not frivolous under 11(b)(2) given that it sought, without legal support, to vacate the case's dismissal, which was predicated on the settlement, while wanting the settlement enforced; (4) did not contain factual contentions lacking evidentiary support under 11(b)(3) when the motion was predicated in part on "newly acquired information" when there was none; and (5) why

6

his conduct was not egregious, warranting sanctions under the Court's inherent authority, since he failed to attend the evidentiary hearing despite being told by the Court that he needed to be there and the hearing was scheduled on a particular day to accommodate him.

Sansoni responded on October 6, addressing each point in the Court's Order. (ECF 103). The Court then held a show cause hearing on October 10. (ECF 104).

III

Rule 11 imposes an affirmative duty on an attorney to conduct a reasonable inquiry into the factual and legal bases of all claims before filing any document with the court. *Bus. Guides, Inc. v. Chromatic Commc'ns Ents., Inc.*, 498 U.S. 533, 551 (1991). The Rule reads:

> (b) Representations to the Court. By presenting to the court a pleading, written motion, or other paper—whether by signing, filing, submitting, or later advocating it—an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:
>
> (1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;
>
> (2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law;
>
> (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery.

Fed. R. Civ. P. 11(b)(1)–(3). The Court may, *sua sponte*, order an attorney to show cause why their conduct does not violate Rule 11. Fed. R. Civ. P. 11(c)(3).

7

In deciding whether to impose Rule 11 sanctions, a court must determine whether the attorney's conduct was reasonable under the circumstances. *See Bus. Guides, Inc,* 498 U.S. at 551. Reasonableness is "objective knowledge or belief at the time of the filing of the challenged paper" that the claim is well-grounded in law and fact. *Ford Motor Co. v. Summit Motor Prod., Inc.*, 930 F.2d 277, 289 (3d Cir. 1991) (quoting *Jones v. Pittsburgh Nat. Corp.*, 899 F.2d 1350, 1357 (3d Cir. 1990)). Sanctions are only imposed in "exceptional circumstances where a claim or motion is patently unmeritorious or frivolous." *Doering v. Union Cty. Bd. of Chosen Freeholders*, 857 F.2d 191, 194 (3d Cir. 1988) (quoting *Gaiardo v. Ethyl Corp.*, 835 F.2d 479, 483 (3d Cir. 1987)).

IV

Material portions of Sansoni's response to the show cause order, as well as his representations to the Court at the hearing, were false or, at a minimum, not credible. In many instances, they were contradictory.[1] The hearing confirmed that his motion to vacate this case's dismissal advanced frivolous legal arguments unwarranted by existing law and contained factual assertions lacking evidentiary support. Sansoni lacked knowledge of both the law and facts, allowing the Court to find he improperly attempted to use the Court, and the threat of sanctions against Rayz, primarily to

---

[1] For example, the Court was unambiguous during the September 22 telephone conference (ECF 91) that both Sansoni and Byfield were required to attend the hearing in person. In his response to the show cause order, Sansoni claimed he neither believed nor realized he had to be there yet at the same time admits that the Court rejected his request to hold the hearing "by video via the internet." He then claimed for the first time in his response that he has a "disability" which made it difficult for him to travel to Philadelphia but admits he never told the Court about it. (Resp. To. Show Cause Order, at 2). As the hearing approached, he again tried to convince the Court to conduct his sanctions hearing by video, again citing a disability which makes travel difficult. The Court observed no disability during the in-person sanctions hearing.

allocate more of the settlement proceeds to Byfield, with Sansoni then claiming a percentage of those additional monies.

A

The Court asked Sansoni to show cause why his motion was not filed for an improper purpose and frivolous since it sought, without any legal support, to vacate the case's dismissal, somehow without disturbing the settlement, so he could attempt to have Rayz sanctioned. Rule 11 requires counsel to conduct a "reasonable inquiry into both the facts and the law supporting a particular pleading." *In re Prudential Ins. Co. Am. Sales Practice Litig. Actions*, 278 F.3d 175, 187 n.7 (3d Cir. 2002).

Sansoni admitted he did no research to support his "unprecedented" goal of reopening the case while leaving intact the settlement which formed the basis for the dismissal:

> Court: Okay, did you conduct—what legal authority or legal research did you do before filing a motion with me and arguing that I could vacate the dismissal so that you could file a Rule 11 motion? Yet at the same time, I had to honor the settlement because that was a binding contract. What legal research or legal argument did you then have or do have now as to my ability to do that?
>
> Sanoni: For that specific issue, no, Your Honor.

(Show Cause Hr'g Tr. 18:14-21). Sansoni cited to E.D. Pa. Civ. R. 41.1.(b) as authority for what he was trying to do, (Mot. To Vacate, at ¶ 3), but that rule allows courts to vacate or modify a dismissal within ninety days when parties show good cause pursuant to the standards set forth in Federal Rule of Civil Procedure 60(b).[2] Though

---

[2] Under Rule 60(b), courts may reopen proceedings for reasons such as mistake, newly discovered evidence, fraud, or any other reason justifying relief. If Sansoni merely wanted to reopen the case, provided he met the requirements under Rule 60(b), he could have done so. But that is not what he wanted. He wanted to reopen the case without disturbing the settlement. Rule 60(b) does not

9

he said the research "would have been done," (Show Cause Hr'g Tr. 24:8), Rule 11 requires counsel to research claims **before** filing, not after. *See Gaiardo v. Ethyl Corp.*, 835 F.2d 479, 482 (3d Cir. 1987) (emphasis added).

Sansoni relied on an inapplicable remedy, the ability to file a Rule 11 motion against Rayz, in seeking to simultaneously "reopen" the case but not the settlement. (Mot. To. Vacate, at ¶ 4). Rule 11(c) applies to any "challenged paper, claim, defense, contention, or denial." Sansoni claims Rayz violated Judge Hey's June 2 notice requiring counsel to attend her settlement conferences with settlement authority. (*Id.* at ¶ 5). First of all, the notice merely outlines Judge Hey's policies and procedures. And to the extent the notice could somehow fall within Rule 11(c)'s ambit, Rayz could not possibly have violated it because there never was a settlement conference—the case settled before the parties made it to Judge Hey. (ECF 84). Sansoni also claims Rayz withheld information from Byfield and even lied to her, but that alleged conduct does not implicate Rule 11. Seitz agreed and said that Sansoni made a mistake in seeking relief under Rule 11 because the Rule was not "the appropriate remedy." (Oral Arg. Tr. 20:7-10). Rule 11 did not apply to anything Rayz allegedy did in his dealings with Byfield, making Sansoni's motion to vacate frivolous, with no basis in existing law.

B

Next, the Court asked Sansoni to explain his assertion that "newly acquired information" warranted reopening the case, especially when Seitz said there was no such information. (Oral Arg. Tr. 55:2-25). Rule 11 requires counsel to "make factual

---

provide authority for such an outcome. Though Sansoni claims Byfield "would have been fine with the Court reopening the settlement," (Resp. to Show Cause Order, at 11, ECF 103), he did not state that in his motion, nor did Seitz take that position at oral argument.

10

contentions that have evidentiary support, or if so specifically identified, will likely have evidentiary support after a reasonable opportunity for further investigation." Fed R. Civ. P. 11(b)(3).  In other words, counsel must "look before leaping."  *Lieb v. Topstone Indus., Inc.*, 788 F.2d 151, 157 (3d Cir. 1986) ("The rule . . . may be seen as a litigation version of the familiar railroad crossing admonition to "stop, look, and listen.").

Sansoni presented no new information or evidence; in fact, a reasonable inquiry would have revealed Sansoni's premise for the motion—that Rayz attended the settlement conference and settled the case without authority—was erroneous.  Had Sansoni even cursorily reviewed the docket, he would have known the case settled and was dismissed on June 12—three days before the scheduled settlement conference.[3]  And as he did a number of times, Sansoni attempted to excuse his lack of investigation and research by claiming that he was under "immense pressure" or "had a small opportunity of time to get it done," notwithstanding that he had three weeks to prepare and file his motion.  (27:10-20, 38:5-17).

Sansoni also premised his motion on the belief Rayz misled Byfield and induced her to sign the settlement agreement in a "cloak-and-dagger way."  (Resp. Show Cause Order, at 9).  But Byfield said she did not read the settlement agreement despite having every opportunity to do so.  (Oral Arg. Tr. 79:14, 80:8-10).  And when she received her $1,500 check which stated it was "Full & Final Payment/Settlement on Any & All Claims," she cashed it the same day rather than immediately disputing the amount.  (Rayz Letter, at 4–5, ECF 93); *Lucachev v. Kerson*, 48 A.2d 857, 858 (Pa. 1946) ("When

---

[3] At the hearing, Sansoni claimed to have checked the docket, yet still believed the case settled after, not before, the settlement conference scheduled for June 15.  His claim to have reviewed the docket with respect to those dates prior to filing his motion was not credible. (Show Cause Hr'g Tr. 41:15-16).

11

there is a dispute or disagreement between the debtor and the creditor as to their respective rights, a payment tendered in full satisfaction of the other's claim operates as an accord and satisfaction if the payment is accepted and retained."). At the show cause hearing, Sansoni said, "I don't have the case law or anything, but it was my understanding that anyone who raised anything in a memo, it does not take away that claim." (Show Cause Hr'g Tr. 73:9-19). Sansoni made the point himself: instead of researching his claims, he relied on his own, incorrect, understanding.

What little, if any, investigation or research Sansoni performed was woefully insufficient. He focused on Rayz's disciplinary history and spoke to a friend who had "issues" with Rayz.[4] (*Id.* at 10:6-15). Contacting a friend with an apparently antagonistic relationship with Rayz, (*id.* at 10:15), and irrelevant citations to Rayz's alleged pending Pennsylvania disciplinary matters do not constitute the reasonable inquiry into the facts and law required by Rule 11.[5]

In addition to ignorance of key facts, Sansoni misled the Court on others. For example, he cherry-picked favorable portions of Byfield's deposition testimony and ignored her unfavorable admissions. Byfield's unsworn statement, drafted by Sansoni,

---

[4] Sansoni kicked off his hearing performance with a tall tale about how Seitz came to represent Byfield at the hearing on Sansoni's motion. He claimed that he really did want to attend the hearing but between the September 22 telephone conference and the hearing date he received a text message "out of the blue," (Show Cause Hr'g Tr. 9:15-25), from a lawyer he initially did not want to identify because, as the Court came to learn, the lawyer has an antagonistic relationship with Rayz. In fact, Sansoni had spoken to this lawyer before filing his motion because he knows many people, like Rayz, in the "Russian community." (*Id.* at 10:17-25, 11:1-5). That "unsolicited" text gave Sansoni the chance to "jokingly," (*id.* at 10:1-10), ask his friend to handle the hearing for him. And that friend happened to think Seitz, who also had some unpleasant history with Rayz, would be a good fill-in. (*Id.* at 9:2–12:25). Expecting the Court to believe that confluence of coincidences was one of Sansoni's many mistakes.

[5] While Sansoni assisted Byfield in filing a disciplinary complaint against Rayz, Sansoni omitted that from his motion because it would be "unprofessional." (*Id.* at 56:18-19).

12

selectively included a portion of her deposition where she said was upset and that her dealings with HRRG raised her blood pressure. (Mot. To Vacate, Ex. A). Using this shred of testimony, Sansoni says that Rayz failed to seek a settlement which included money for actual, as opposed to statutory, damages—something which could have increased Byfield's take in the settlement. But Sansoni left out the following exchange from earlier in Byfield's deposition:

> Counsel: Now, and my original question, just are you claiming that you suffered any kind of emotional harm as a result of any actions by HRRG specifically the letter that you received on August 3, 2017?
>
> [Byfield]: No.

(Rayz Letter, at 3). Sansoni says he was "clarifying" Byfield's earlier statements. (Show Cause Hr'g Tr. 60:18-19). But one cannot clarify something that was omitted. This argument was designed to mislead the Court, and is one of the many factual assertions made by Sansoni in the motion, response to the show cause order and show cause hearing that lack evidentiary support and violate 11(b)(3).

C

Sansoni's motion was also filed for an improper purpose—not as it claimed to enable him to seek sanctions against Rayz for settling the case without authority, but rather to put the squeeze on Rayz to give Byfield some of Rayz's attorneys' fees. Sansoni did not know the facts, conducted minimal, if any, legal research and sought a sanction against Rayz that, even if successful, would not have resulted in Byfield receiving a greater share of the settlement proceeds. Despite references to "justice" and claiming that "a wrong was committed," (Resp. To Show Cause Order, at 9, ECF 103), at least three things reveal the motion's improper purpose: (1) Sansoni's and Seitz's

13

statements during their respective hearings before the Court; (2) the emails Sansoni sent to Rayz before and after filing the motion; and (3) Byfield's statement (the motion's sole exhibit).

First, in one of his rare moments of candor during the show cause hearing, Sansoni said the quiet part out loud: if Byfield had received seventy percent of the settlement "there would have been no need to go to the Court for justice." (Show Cause Hr'g Tr. 49:24–50:1-3). Sansoni's statement dovetails with Seitz's position at oral argument, where he admitted Sansoni's motion was legally unsupported, factually inaccurate and said Byfield preferred money, not sanctions. Seitz immediately backed off the Rule 11 sanctions, stating "prior counsel made a mistake," (Oral Arg. Tr. 20:5-10), and said the motion was inaccurate insofar as there was no newly acquired information justifying reopening the case under Rule 60. (*Id.* at 55:2-25). He also said Byfield was more interested in a greater portion of the settlement than sanctioning Rayz:

> The Court: What does Ms. Byfield want? Does Ms. Byfield want Mr. Rayz sanctioned by the Court? Or does Ms. Byfield want Mr. Rayz to give her $92,500?
>
> Mr. Seitz: She would prefer the money, Your Honor.

(*Id.* at 54:25).

Next, emails Sansoni sent to Rayz before and after filing the motion to vacate leave no doubt about what Sansoni was after all along—and it was not Rule 11 sanctions against Rayz. Sansoni's August 21, 2023 email told Rayz that he now represents "Hermine Byfield, your former client" and requested a copy of "the fee agreement that you had with her" for the FDCPA case against HRRG. (Rayz Letter,

14

Ex. 4, at 35). Two days later, Sansoni sent his email to Rayz categorizing this as a "fee dispute case." (*Id.* Ex. 6, at 40). And two days after that, Sansoni was back at it again, this time dropping all pretenses and demanding $95,200.000, representing "70% of the settlement proceeds." (*Id.* Ex. 7, at 44). Rayz then offered to resolve the dispute through private mediation, (*id.* Ex. 6, at 40), but Sansoni declined the offer, saying Byfield "wants to get a decision from the federal judge first," (*id.* Ex. 10, at 54), presumably hoping the Court would reopen the case, allow him to file a Rule 11 sanctions motion and thus have greater bargaining power against Rayz.

But after the September 22 conference, when Sansoni realized he had to come to Philadelphia and put up or shut up, private mediation sounded pretty good. He now wished to accept Rayz's previous offer to mediate and said he "discussed the situation with Ms. Byfield, and she has agreed to follow *my* recommendation and is accepting your offer to resolve her claim against you and your firm by binding arbitration" and offered to file a praecipe with the Court withdrawing his motion. (Resp. To Show Cause Order, Ex. 2, at 7) (emphasis added). But by this point Rayz had apparently had enough and opted to proceed to the evidentiary hearing. Sansoni then very quickly farmed the case out to Seitz and did not attend the October 3 hearing. Byfield (after firing Sansoni) declined to testify, withdrew the motion and forfeited all potential civil action against Rayz.

Finally, Byfield's statement to the disciplinary board—the only exhibit to the motion to vacate—reveals Byfield's primary gripe with Rayz, namely, the allocation of the settlement amount. The final paragraph of that statement asks for "70% of the

15

$136,000" settlement. It does not mention sanctioning Rayz. (Mot. To Vacate, Ex. A, at 9).

### III

A sanction is appropriate when it is the minimum required to deter the undesirable behavior. *Doering*, 857 F.2d at 194. District courts have wide discretion to select the type of sanction under Rule 11. *Lieb*, 788 F.2d at 158. Because cases lie along a continuum, courts consider factors such as the willfulness of the violation, the attorney's reputation, or alternatively, history of filing frivolous actions and the degree of frivolousness involved in the present case. *See, e.g. Doering*, 857 F.2d at 194.

Considering the totality of his transgressions—filing a baseless motion, advancing frivolous claims, exercising little due diligence in crafting his motion and lying to the Court—a $1,000 sanction to be paid to the Court's registry is appropriate. Sansoni never should have filed his motion, which subjected Rayz to the burden of further litigation and put the Court through the time-consuming process of reading the motion and all responses and exhibits, conducting a telephone conference and scheduling and holding a hearing. He willfully and improperly used his motion to leverage a settlement in his fee dispute with Rayz. His sought-after relief—Rule 11 sanctions—was inapplicable.

The Court takes no pleasure in issuing this sanction. Imposing sanctions demands extraordinary time, effort and judicial resources, which explains why courts often decide sanctions are not worth the trouble and misconduct by lawyers goes unaddressed and undeterred. In this case, Sansoni has no history of other Rule 11

violations,[6] maintains a limited immigration practice, and rarely, if ever, appears in this Court. Had he owned his mistakes and sincerely apologized, it would not have come to this. But Sansoni's conduct was too egregious to ignore. His motion was frivolous, improper and factually unsupported, and worse yet were his lies, misleading assertions and refusal to admit any wrongdoing. This sanction is the Court's best effort to deter Sansoni from ever again engaging in similar conduct.

An accompanying Order follows.

BY THE COURT:

*/s/ Gerald J. Pappert*
GERALD J. PAPPERT, J.

---

[6] Sansoni acknowledged some involvement with the disciplinary board in "some weird case from twenty years ago." (Show Cause Hr'g Tr. 106:11-14). The Court's research has not shown he was ever formally disciplined.